**STATE of Minnesota, Respondent,**

v.

**CHRISTY PONTIAC–GMC,
INC., Appellant.**

Nos. C1–82–1209, C0–83–689.

Supreme Court of Minnesota.

Aug. 31, 1984.

Rehearing Denied Oct. 1, 1984.

Jack S. Nordby, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Thomas J. Foley, County Atty., Steven C. DeCoster, Asst. County Atty., St. Paul, for respondent.

SIMONETT, Justice.

We hold that a corporation may be convicted of theft and forgery, which are

crimes requiring specific intent, and that the evidence sustains defendant corporation's guilt.

In a bench trial, defendant-appellant Christy Pontiac-GMC, Inc., was found guilty of two counts of theft by swindle and two counts of aggravated forgery, and was sentenced to a $1,000 fine on each of the two forgery convictions. Defendant argues that as a corporation it cannot, under our state statutes, be prosecuted or convicted for theft or forgery and that, in any event, the evidence fails to establish that the acts complained of were the acts of the defendant corporation.

Christy Pontiac is a Minnesota corporation, doing business as a car dealership. It is owned by James Christy, a sole stockholder, who serves also as president and as director. In the spring of 1981, General Motors offered a cash rebate program for its dealers. A customer who purchased a new car delivered during the rebate period was entitled to a cash rebate, part paid by GM and part paid by the dealership. GM would pay the entire rebate initially and later charge back, against the dealer, the dealer's portion of the rebate. Apparently it was not uncommon for the dealer to give the customer the dealer's portion of the rebate in the form of a discount on the purchase price.

At this time Phil Hesli was employed by Christy Pontiac as a salesman and fleet manager. On March 27, 1981, James Linden took delivery of a new Grand Prix for his employer, Snyder Brothers. Although the rebate period on this car had expired on March 19, the salesman told Linden that he would still try to get the $700 rebate for Linden. Later, Linden was told by a Christy Pontiac employee that GM had denied the rebate. Subsequently, it was discovered that Hesli had forged Linden's signature twice on the rebate application form submitted by Christy Pontiac to GM, and that the transaction date had been altered and backdated to March 19 on the buyer's order form. Hesli signed the order form as "Sales Manager or Officer of the Company."

On April 6, 1981, Ronald Gores purchased a new Le Mans, taking delivery the next day. The rebate period for this model car had expired on April 4, and apparently Gores was told he would not be eligible for a rebate. Subsequently, it was discovered that Christy Pontiac had submitted a $500 cash rebate application to GM and that Gores' signature had been forged twice by Hesli on the application. It was also discovered that the purchase order form had been backdated to April 3. This order form was signed by Gary Swandy, an officer of Christy Pontiac.

Both purchasers learned of the forged rebate applications when they received a copy of the application in the mail from Christy Pontiac. Both purchasers complained to James Christy, and in both instances the conversations ended in angry mutual recriminations. Christy did tell Gores that the rebate on his car was "a mistake" and offered half the rebate to "call it even." After the Attorney General's office made an inquiry, Christy Pontiac contacted GM and arranged for cancellation of the Gores rebate that had been allowed to Christy Pontiac. Subsequent investigation disclosed that of 50 rebate transactions, only the Linden and Gores sales involved irregularities.

In a separate trial, Phil Hesli was acquitted of three felony charges but found guilty on the count of theft for the Gores transaction and was given a misdemeanor disposition. An indictment against James Christy for theft by swindle was dismissed, as was a subsequent complaint for the same charge, for lack of probable cause. Christy Pontiac, the corporation, was also indicted, and the appeal here is from the four convictions on those indictments. Before trial, Mr. Christy was granted immunity and was then called as a prosecution witness. Phil Hesli did not testify at the corporation's trial.

I.

■ Christy Pontiac argues on several grounds that a corporation cannot be held criminally liable for a specific intent crime.

Minn.Stat. § 609.52, subd. 2 (1982), says "whoever" swindles by artifice, trick or other means commits theft. Minn.Stat. § 609.625, subd. 1 (1982), says "whoever" falsely makes or alters a writing with intent to defraud, commits aggravated forgery. Christy Pontiac agrees that the term "whoever" refers to persons, and it agrees that the term "persons" *may* include corporations, *see* Minn.Stat. § 645.44, subd. 7 (1982), but it argues that when the word "persons" is used here, it should be construed to mean only natural persons. This should be so, argues defendant, because the legislature has defined a crime as "conduct which is prohibited by statute and for which the actor may be sentenced to imprisonment, with or without a fine," Minn. Stat. § 609.02, subd. 1 (1982), and a corporation cannot be imprisoned. Neither, argues defendant, can an artificial person entertain a mental state, let alone have the specific intent required for theft or forgery.

We are not persuaded by these arguments. The Criminal Code is to "be construed according to the fair import of its terms, to promote justice, and to effect its purposes." Minn.Stat. § 609.01, subd. 1 (1982). The legislature has not expressly excluded corporations from criminal liability and, therefore, we take its intent to be that corporations are to be considered persons within the meaning of the Code in the absence of any clear indication to the contrary. *See, e.g.,* Minn.Stat. § 609.055 (1982) (legislative declaration that children under the age of 14 years are incapable of committing a crime). We do not think the statutory definition of a crime was meant to exclude corporate criminal liability; rather, we construe that definition to mean conduct which is prohibited and, if committed, *may* result in imprisonment. Interestingly, the specific statutes under which the defendant corporation was convicted, sections 609.52 (theft) and 609.625 (aggravated forgery), expressly state that the sentence may be either imprisonment *or* a fine.

Nor are we troubled by any anthropomorphic implications in assigning specific intent to a corporation for theft or forgery.

There was a time when the law, in its logic, declared that a legal fiction could not be a person for purposes of criminal liability, at least with respect to offenses involving specific intent, but that time is gone. If a corporation can be liable in civil tort for both actual and punitive damages for libel, assault and battery, or fraud, it would seem it may also be criminally liable for conduct requiring specific intent. Most courts today recognize that corporations may be guilty of specific intent crimes. *See, e.g., Commonwealth v. Beneficial Finance Co.,* 360 Mass. 188, 275 N.E.2d 33 (1971), and cases collected therein; *State v. Graziani,* 60 N.J.Super. 1, 158 A.2d 375 (1959) (car dealership selling used cars as new convicted of obtaining money from customers under false pretenses), *aff'd,* 31 N.J. 538, 158 A.2d 330, *cert. denied,* 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524 (1960). *See also,* Brickley, *Corporate Criminal Accountability,* 60 Wash.U.L.Q. 393 (1982); Annot., *Criminal Liability of Corporations for Bribery or Conspiracy to Bribe Public Official,* 52 A.L.R.3d 1274 (1973). Particularly apt candidates for corporate criminality are types of crime, like theft by swindle and forgery, which often occur in a business setting.

We hold, therefore, that a corporation may be prosecuted and convicted for the crimes of theft and forgery.

## II.

There remains, however, the evidentiary basis on which criminal responsibility of a corporation is to be determined. Criminal liability, especially for more serious crimes, is thought of as a matter of personal, not vicarious, guilt. One should not be convicted for something one does not do. In what sense, then, does a corporation "do" something for which it can be convicted of a crime? The case law, as illustrated by the authorities above cited, takes differing approaches. If a corporation is to be criminally liable, it is clear that the crime must not be a personal aberration of an employee acting on his own; the criminal

activity must, in some sense, reflect corporate policy so that it is fair to say that the activity was the activity of the corporation. There must be, as Judge Learned Hand put it, a "kinship of the act to the powers of the officials, who commit it." *United States v. Nearing*, 252 F. 223, 231 (S.D.N.Y.1918).

We believe, first of all, the jury should be told that it must be satisfied beyond a reasonable doubt that the acts of the individual agent constitute the acts of the corporation. Secondly, as to the kind of proof required, we hold that a corporation may be guilty of a specific intent crime committed by its agent if: (1) the agent was acting within the course and scope of his or her employment, having the authority to act for the corporation with respect to the particular corporate business which was conducted criminally; (2) the agent was acting, at least in part, in furtherance of the corporation's business interests; and (3) the criminal acts were authorized, tolerated, or ratified by corporate management.

This test is not quite the same as the test for corporate vicarious liability for a civil tort of an agent. The burden of proof is different, and, unlike civil liability, criminal guilt requires that the agent be acting at least in part in furtherance of the corporation's business interests. *Compare Marston v. Minneapolis Clinic of Psychiatry*, 329 N.W.2d 306 (Minn.1983) (civil vicarious liability). Moreover, it must be shown that corporate management authorized, tolerated, or ratified the criminal activity. Ordinarily, this will be shown by circumstantial evidence, for it is not to be expected that management authorization of illegality would be expressly or openly stated. Indeed, there may be instances where the corporation is criminally liable even though the criminal activity has been expressly forbidden. What must be shown is that from all the facts and circumstances, those in positions of managerial authority or responsibility acted or failed to act in such a manner that the criminal activity reflects corporate policy, and it can be said, therefore, that the criminal act was authorized or tolerated or ratified by the corporation.

Christy Pontiac argues that it cannot be convicted of aiding the very actor whose acts are deemed its own acts; in other words, it argues that it cannot aid itself. Perhaps because it was uncertain of the legal rationale for corporate criminal liability, the state, in each of the four counts of the indictment, alleged that Christy Pontiac "then and there being aided and abetted by another and aiding and abetting another" did commit the crime. We construe the indictment, however, to allege alternatively that Christy Pontiac committed the crimes as a principal or as an aider and abetter. The trial court, without objection, considered the corporation to be prosecuted and convicted as a principal, as do we.

### III.

■ This brings us, then, to the third issue, namely, whether under the proof requirements mentioned above, the evidence is sufficient to sustain the convictions. We hold that it is.

The evidence shows that Hesli, the forger, had authority and responsibility to handle new car sales and to process and sign cash rebate applications. Christy Pontiac, not Hesli, got the GM rebate money, so that Hesli was acting in furtherance of the corporation's business interests. Moreover, there was sufficient evidence of management authorization, toleration, and ratification. Hesli himself, though not an officer, had middle management responsibilities for cash rebate applications. When the customer Gores asked Mr. Benedict, a salesman, about the then discontinued rebate, Benedict referred Gores to Phil Hesli. Gary Swandy, a corporate officer, signed the backdated retail buyer's order form for the Linden sale. James Christy, the president, attempted to negotiate a settlement with Gores after Gores complained. Not until after the Attorney General's inquiry did Christy contact divisional GM headquarters. As the trial judge noted, the rebate money "was so obtained and accepted by Christy Pontiac and kept by Christy Pontiac until somebody blew the whistle

* * *." We conclude the evidence establishes that the theft by swindle and the forgeries constituted the acts of the corporation.

We wish to comment further on two aspects of the proof. First, it seems that the state attempted to prosecute both Christy Pontiac and James Christy, but its prosecution of Mr. Christy failed for lack of evidence. We can imagine a different situation where the corporation is the alter ego of its owner and it is the owner who alone commits the crime, where a double prosecution might be deemed fundamentally unfair. Secondly, it may seem incongruous that Hesli, the forger, was acquitted of three of the four criminal counts for which the corporation was convicted. Still, this is not the first time different trials have had different results. *See, e.g., State v. Cegon,* 309 N.W.2d 313 (Minn.1981). We are reviewing this record, and it sustains the convictions.

Affirmed.

KELLEY, J., took no part in the consideration or decision of this case.