**STATE of Minnesota, Respondent,**

v.

**COMPASSIONATE HOME CARE, INC., Appellant.**

No. CX–01–683.

Court of Appeals of Minnesota.

Feb. 12, 2002.

As Corrected Feb. 27, 2002.

---

Mike Hatch, Attorney General, Sara De-Santo, Assistant Attorney General, St. Paul (for respondent).

Richard H. Kyle, Jr., Minneapolis, (for appellant).

Considered and decided by WILLIS, Presiding Judge, CRIPPEN, Judge, and ANDERSON, Judge.

## OPINION

WILLIS, Judge.

This appeal is from a conviction of criminal neglect of a vulnerable adult in violation of Minn.Stat. § 609.233, subd. 1 (1996). Because the district court abused its discretion in instructing the jury and erred in responding to a jury question without notifying counsel, we reverse and remand.

## FACTS

Appellant Compassionate Home Care (CHC) is a corporation that is licensed to provide home-care services. In 1997, at the time of the events charged in the criminal complaint, CHC was owned by Charlie and Roberta Parker, and Trina Asche, the assistant administrator, was in charge of its day-to-day operations.

Since 1989, CHC had provided home-care services to Carol Forbes, a 52-year-old woman who was quadriplegic and suffered from cerebral palsy, scoliosis, osteoarthritis, degenerative joint disease, and asthma. In May 1997, these services were being provided by Kimberly Benjamin, a personal-care attendant (PCA) recently hired by CHC, as well as other PCAs. At that time, Forbes was living in an apartment complex in Stillwater.

In May 1997, Benjamin gave notice on behalf of Forbes to the manager of the apartment complex that Forbes would be moving out for a week or two to go camping. Benjamin called Asche at CHC's offices in Minneapolis to tell her that she was taking Forbes to the house where Benjamin was living in Isanti County, where Forbes would be "camping" in the backyard for one or two weeks. Benjamin told Asche that Forbes's equipment—a hospital bed and Hoyer lift, along with her medications—would be available in the tent. Asche approved the arrangement.

The state presented evidence that Forbes lived in the tent, whose walls were constructed only of mesh screening, for about ten days, through a wide range of temperatures and weather conditions. The supervising nurse who managed Forbes's care told a state investigator that she did not visit Forbes while she lived in the tent, and CHC kept no records documenting the living conditions there. Friends who visited Forbes reported that she seemed happy but that she also seemed isolated. Benjamin was not attending Forbes when the friends arrived, and she did not return until the friends had been there for two hours.

In early June, Benjamin moved Forbes from the tent into an upstairs bedroom in the house. The supervising nurse visited the house on June 10 and reported no problems with the living arrangements when she called Asche. Forbes's mother, however, visited her in Benjamin's house and testified that Forbes was in a very small bedroom, with no lift by her bed, and no air conditioning, although the weather was very hot. She also testified that, despite her daughter's asthma and allergies, there were three cats and two dogs in the house, as well as three smokers. When Forbes's social worker informed state officials of the change in Forbes's living situa-

tion, a state agency employee, later joined by Forbes's social worker and a representative of a private agency, visited the house and determined that the living conditions were "not safe." After the social worker began the process of having a conservator appointed, CHC moved Forbes out of Benjamin's house. Forbes died of a blood clot in her lungs the following month.

The state filed a criminal complaint charging CHC with neglect of a vulnerable adult. Shortly before trial, CHC requested that the district court instruct the jury on corporate criminal liability. The state submitted a proposed jury instruction on corporate criminal liability, although the prosecutor also argued that such an instruction was not necessarily appropriate. The district court declined to instruct the jury on corporate criminal liability, concluding that the legislature, in enacting the neglect statute, "clearly contemplated a corporate caregiver," yet had not attempted to define corporate criminal liability.

During its deliberations, the jury sent a written question to the court, asking

Is Compassionate Care liable & responsible for the actions of their employees?

The district court, without notifying counsel, responded in writing, through the bailiff:

I can't give you any further instructions. You will have to decide based on what you've been given.

The jury found CHC guilty of neglect of a vulnerable adult, in violation of Minn. Stat. § 609.233, subd. 1 (1996). CHC moved for a new trial, arguing that the district court erred in failing to instruct the jury on corporate criminal liability and by responding to the jury's question during deliberations without first notifying counsel. The district court denied CHC's motion. This appeal follows.

## ISSUES

1. Did the district court abuse its discretion in refusing to instruct the jury on corporate criminal liability?

2. Did the district court prejudicially err in responding to a jury question without first notifying counsel?

## ANALYSIS

### I.

A district court is given "considerable latitude" in selecting the language of jury instructions. *State v. Gray*, 456 N.W.2d 251, 258 (Minn.1990) (quotations omitted). The refusal to give a particular jury instruction lies within the district court's discretion "and no error results if no abuse of discretion is shown." *State v. Cole*, 542 N.W.2d 43, 50 (Minn.1996). A party is entitled to a particular jury instruction if the evidence presented at trial supports the instruction. *State v. Auchampach*, 540 N.W.2d 808, 816 (Minn. 1995). Jury instructions are viewed in their entirety to determine whether the law of the case is fairly and adequately explained. *State v. Flores*, 418 N.W.2d 150, 155 (Minn.1988).

During trial, CHC requested a jury instruction on corporate criminal liability, based on language in *State v. Christy Pontiac–GMC, Inc.*, 354 N.W.2d 17, 20 (Minn. 1984). The district court declined to give the requested instruction, concluding that because the criminal neglect statute "clearly contemplated a corporate caregiver" but the legislature had not included the language from *Christy Pontiac–GMC*, the standard jury instruction on the offense of criminal neglect was sufficient.

The criminal-neglect statute provides:

A caregiver or operator who intentionally neglects a vulnerable adult or knowingly permits conditions to exist that

result in the abuse or neglect of a vulnerable adult is guilty of a gross misdemeanor.

Minn.Stat. § 609.233, subd. 1 (1996). A "caregiver" is defined, in part, as an "individual or facility" that has "assumed responsibility" for the care of a vulnerable adult. Minn.Stat. § 609.232, subd. 2 (1996). CHC conceded at trial that it was a "caregiver." In particular, it appears that CHC was a "home care provider licensed or required to be licensed" and therefore a "facility." Minn.Stat. § 609.232, subd. 3 (1996).

The supreme court in *Christy Pontiac–GMC* held that "a corporation may be prosecuted and convicted for the crimes of theft and forgery." 354 N.W.2d at 19. The court, however, went on to lay out "the evidentiary basis on which criminal responsibility of a corporation is to be determined." *Id.* The court stated:

> We believe, first of all, the jury should be told that it must be satisfied beyond a reasonable doubt that the acts of the individual agent constitute the acts of the corporation.

*Id.* at 20. The court went on to specify "the kind of proof required," stating:

> we hold that a corporation may be guilty of a specific intent crime committed by its agent if: (1) the agent was acting within the course and scope of his or her employment, having the authority to act for the corporation * * *; (2) the agent was acting, at least in part, in furtherance of the corporation's business interests; and (3) the criminal acts were authorized, tolerated, or ratified by corporate management.

*Id.*

██ The state argues that *Christy Pontiac–GMC* does not apply here because CHC was not charged with a specific-intent crime. The statute imposes criminal liability on a caregiver who "knowingly permits" conditions to exist that result in the abuse or neglect of a vulnerable adult. Minn.Stat. § 609.233, subd. 1. Specific intent requires that the defendant acted with the intent to produce a specific result. *State v. Orsello*, 554 N.W.2d 70, 72 (Minn. 1996). The statutory language relied on by the state ("knowingly permit[s]") does not imply any intent to produce the prohibited result. But the statute also imposes criminal liability on a caregiver who "intentionally neglects" a vulnerable adult. Minn.Stat. § 609.233, subd. 1. In instructing the jury on the elements, the court included the "intentionally neglects" language, and even defined the term "intentionally."

CHC argues that the prosecution presented to the jury the theory that CHC intentionally neglected Forbes, as well as the theory that it "knowingly permitted" conditions of neglect. We agree that the prosecution argued to the jury several omissions on the part of CHC from which the jury could infer specific intent to neglect Forbes. The prosecutor emphasized CHC's failure to do an assessment of the living conditions in the tent, an omission that suggested intentional neglect while precluding the knowledge required to "knowingly permit." Moreover, the jury was not told who at CHC needed to "knowingly permit" conditions of neglect in order for the corporation to be guilty.

The prosecutor also argued that CHC failed to properly assess Forbes's living conditions in Benjamin's house and failed to keep adequate records. In listing these omissions, the prosecutor was arguing intentional neglect by CHC, not merely conditions that it permitted to exist. Furthermore, the jury, in asking about CHC's liability for the "actions" of its employees, appears to have focused on acts or omissions that could have been intentional, not

merely on corporate knowledge or conditions that were permitted to exist.

■ The court has an obligation to clearly instruct the jury on exactly what it is they must decide. *Rosillo v. State,* 278 N.W.2d 747, 749 (Minn.1979). The district court's instructions did not inform the jury exactly how it was to determine, from the evidence of what various CHC employees knew and what actions they took, what the *corporation* intended to do or "knowingly permitted" to happen to Carol Forbes. The district court concluded that the language of the criminal-neglect statute was sufficient. But, as the supreme court has held, it is desirable to explain the elements of the offense, not merely to read the statute. *State v. Kuhnau,* 622 N.W.2d 552, 556 (Minn.2001). Here, while the district court gave the standard jury instruction on criminal neglect, CRIMJIG 13.76, it gave the jury no instruction on whose acts or knowledge could be imputed to the corporation. The court referred to the "defendant's act" and defined the requisite knowledge of the "actor" but did not tell the jury how or through whom a legal entity such as a corporation could act or have knowledge.

■ The state argues that any error in failing to instruct the jury on corporate criminal liability was harmless because there was ample evidence to establish CHC's guilt, even under the *Christy Pontiac–GMC* test, and because the attorneys' closing arguments emphasized that corporate liability had to be based on the conduct of corporate management. An error in instructing the jury is harmless if it can be said beyond a reasonable doubt that the error had no significant impact on the verdict. *State v. Pendleton,* 567 N.W.2d 265, 270 (Minn.1997).

■ The state points to the evidence that CHC's management (the Parkers and Asche) knew that Forbes was living in a tent and then in a bedroom in Benjamin's house. But there was conflicting evidence on whether those living situations by themselves constituted neglect. The evidence was not overwhelming that living in a tent for seven to ten days, a "camping" experience that Forbes had eagerly sought, constituted "neglect" or that CHC's management knew of conditions inside Benjamin's house that would constitute "neglect." *See* Minn.Stat. § 609.233, subd. 1 (defining neglect as failure to provide vulnerable adult with "necessary food, clothing, shelter, health care, or supervision"). Moreover, the jury's question, which was directed at corporate criminal liability, indicates that the court's failure to instruct on that subject may have had a significant impact on the verdict.

## II.

CHC also argues that the district court erred in responding to the jury's written question about corporate criminal liability, submitted during the jury's deliberations, without giving notice to defense counsel.

The rule provides:

> If the jury, after retiring for deliberation, desires to be informed on any point of law, the jurors, after notice to the prosecutor and defense counsel, shall be conducted to the courtroom.

Minn. R.Crim. P. 26.03, subd. 19(3)1. The supreme court has recently emphasized the mandatory nature of the rule. *State v. Sessions,* 621 N.W.2d 751, 755–56 (Minn. 2001) (noting that rule requiring that jury be conducted to the courtroom is mandatory and does not depend on the nature of the court's response).

■ We conclude that the district court erred in failing to notify counsel of the question and in answering it without prior notification. As discussed above, the jury's question signaled its need for an instruction on corporate criminal liability.

Had CHC's attorney been notified of the jury's question, he could have argued, with additional support, the need for such an instruction. Because we have concluded that failure to instruct on corporate criminal liability was reversible error, we need not determine whether the failure to notify counsel of the jury's question would by itself warrant a new trial.

## DECISION

The district court abused its discretion in refusing to instruct the jury on corpo-rate criminal liability. The court also erred in answering a jury question on that subject without first notifying counsel.

**Reversed and remanded.**