Kenneth BROWN and Robert Banks, individually and on behalf of the State of Minnesota, Respondents,

v.

CANNON FALLS TOWNSHIP, et al., Appellants.

Nos. A05–2340, A05–2341, A05–2342, A05–2343.

Court of Appeals of Minnesota.

Oct. 10, 2006.

David Hvistendahl, Mary L. Hahn, Hvistendahl, Moersch, & Dorsey, P.A., Northfield, MN, for respondents.

Paul D. Reuvers, Jeffrey A. Egge, Iverson Reuvers, LLC, Bloomington, MN, for appellants.

Joseph E. Flynn, Jennifer K. Earley, Knutson, Flynn, & Deans, P.A., Mendota Heights, MN, for amicus curiae Minnesota School Boards Association.

Daniel J. Greensweig, St. Michael, MN, for amicus curiae Minnesota Association of Townships.

Susan L. Naughton, League of Minnesota Cities, St. Paul, MN, for amicus curiae League of Minnesota Cities.

Jay T. Squires, Nicole L. Tuescher, Ratwik, Roszak & Maloney, P.A., Minneapolis, MN, for amicus curiae Association of Minnesota Counties.

Considered and decided by KALITOWSKI, Presiding Judge; RANDALL, Judge; and PETERSON, Judge.

## OPINION

RANDALL, Judge.

Appellants challenge the district court's judgment and amended judgment declaring that they committed violations of the Minnesota Open Meeting Law, imposing

fines, awarding costs, disbursements, and reasonable attorney fees, and declaring that appellants have forfeited their right to serve on the Cannon Falls Township Board of Supervisors, "effective immediately." Appellants argue that (a) municipal officials are not subject to removal from office for multiple open meeting law violations adjudicated in a single proceeding; (b) the reliance on the advice of the township attorney and town clerk regarding compliance with the open meeting law should negate a finding of intentional violation; (c) the law does not authorize the award of $13,000 to each respondent for costs, disbursements, and attorney fees; (d) respondents were not entitled to special notice of a meeting concerning the township attorney's representation of the township; (e) the town board of supervisors was exempt from the notice requirements under Minn.Stat. § 366.01 (2002), because they performed a site inspection; (f) an official who did not attend the meeting could not intentionally violate the open meeting law; (g) respondents were not entitled to special notice for the December 5, 2002 meeting concerning possible ordinance revisions; and (h) the finding that one of the appellants violated the open meeting law was clearly erroneous when no evidence was introduced that he was aware of respondents' request for special notice. Respondents filed a notice of review seeking a review of the award of attorney fees.

Because public officials are not subject to removal from office until there have been findings of intentional violations of the open meeting law in three separate actions, we reverse the district court's order removing appellants from office. We affirm on all other issues and deny respondents' request for an award of additional attorney fees on appeal.

## FACTS

This appeal concerns allegations of intentional open meeting law violations for meetings that occurred from June 2002, through December 2002, in the Cannon Falls Township ("the township"). The township is governed by a three-member town board of supervisors. At the time of the alleged open meeting law violations, the board consisted of appellants Gary Hovel, Lawrence Johnson, and Keith Mahoney. Both Hovel and Mahoney are farmers and own feedlots in the township.

Respondents Ken Brown and Robert Banks own adjacent properties in the township. Their properties are also adjacent to property owned by Hovel. Both respondents' properties and Hovel's property are located in section 28 of the township and are zoned A–2. According to the township's zoning ordinances, property zoned A–2 restricts the number of residential units to 12 residential units per section. Because of the restrictions on the number of residential units per section, there is a fair amount of competition for building space.

In late 2001, Banks met with the Goodhue County administrator and advised her that he intended to apply for a building permit to build on his property. Shortly thereafter, respondents learned that Hovel had registered his neighboring property as a feedlot. Although Hovel owned a 3,000 unit hog feedlot in section 33 of the township, Hovel's newly registered feedlot, adjacent to respondents' properties, consisted of a shed and some accompanying pasture that housed about eight-to-ten cattle. That Hovel had actually registered his shed as a feedlot concerned Banks because of the proximity of Banks' property to Hovel's property. According to Goodhue County ordinances, residential building was prohibited within 2,000 feet of a registered feedlot, and *vice*

*versa.*[1] Because the setback distances went both ways, it was first-come-first-serve as between a feedlot registrant and a building permit applicant, meaning one could knock out the rights of the other.

In early 2002, respondents met with the Goodhue County Attorney and raised their concern that Hovel had improperly registered a feedlot on his property because the feedlot was within 2,000 feet of respondents' properties. Based on the county attorney's recommendation, respondents submitted a complaint on the issue to the county. At about the same time, respondents learned that the Albers, who owned property adjacent to Banks, had also recently registered for a feedlot. Although Jack Albers was confined to a wheel chair and owned only five horses, respondents learned that Hovel convinced the Albers to fill out a feedlot registration form.[2]

Adding to their concern over their prospective building rights was respondents' discovery that the township attorney, Michael Ojile, who also served as Hovel's personal attorney, had registered a feedlot. Ojile had registered a feedlot for 50 animals despite the fact that he owned just two horses. Also, respondents were aware of pending litigation involving another township resident, Mark Olson. The Olson litigation concerned the township's revocation of Olson's building permit. Although Olson commenced litigation against the county, the township, through outside counsel, presented the township's position that Olson should not be granted a build-

ing permit due to the existence of Hovel's larger feedlot located in section 33 of the township.

On March 12, 2002, respondents, through their attorney, sent a letter to the township clerk requesting notice of certain meetings under the Minnesota Open Meeting Law. This letter stated that:

> Our firm has been retained by a number of township residents, who wish to be notified of any special and regular township meetings that address the following topics:
>
> 1. Feedlot permits and set backs from residential properties;
>
> 2. Feedlot permits issued within Cannon Falls' urban expansion district or within two miles of the city limits;
>
> This demand is made pursuant to Section 13D.04, subd. 2(d) of the Minnesota Open Meeting Law. This letter is directed to you as the responsible official under the Open Meeting Law.
>
> Please provide notice to [respondents].

According to Brown, he wanted to send the letter because something "smelled fishy," and he was concerned about being "sandbagged" by Hovel.

The March 12 letter was copied to Ojile, and according to Ojile's billing records, he reviewed the letter on March 14, 2002. Ojile also performed statutory research regarding open meeting notices and the open meeting law. The letter was subsequently discussed with the township board at one of the June meetings.[3] At this time, the

---

1. The township ordinance required that the setback distance between residential construction and feedlots be only 1,320 feet. But under Minn.Stat. § 394.33 (2002), no township can "enforce official controls inconsistent with or less restrictive than the standards prescribed" by the county. Because Goodhue County's 2,000–foot setback requirements between feedlots and residential construction is more restrictive, the township's 1,320–foot

setback requirement was preempted by the county's more restrictive setback requirement.

2. The Albers later rescinded their feedlot registration.

3. Notably, there were no existing minutes documenting when the board discussed the March 12 letter, and none of the appellants

township board consisted of all three appellants.

Ojile informed the board that it was his opinion that the March 12 letter did not trigger the special notice provision in the open meeting law. According to Ojile, he informed the board that it was his opinion that the letter "related to the issuance of feedlot permits, and the Board does not issue feedlot permits, and no notice is required." Relying on Ojile's advice as the township's attorney, appellants, in their capacity as the township board, decided they did not need to provide respondents with any special notices of upcoming discussions of feedlot permits and setback requirements from residential properties. Appellants concede they did not inform respondents of their narrow reading of the letter and their intent not to provide any notice.

The lack of special notice provided to respondents for meetings occurring between June 2002, and December 2002, that discussed feedlot permits and setback requirements from residential properties provided the basis for respondents' claims. The first meeting, occurring on June 17, 2002, concerned Ojile's representation of both Hovel personally and the township board in relation to the Olson litigation. Ojile wrote a letter to the Hovels and to appellants, in their capacity as the board, explaining his dual representation and asking if the board wished for him to continue his representation of the township. The board voted 2–0 with Hovel abstaining, to continue to use Ojile as the township attorney. Respondents did not receive notice of this meeting.

The board also held meetings on both June 18 and 19, 2002. The June 18 meeting involved, in part, a discussion of the Olson litigation. At the June 19 meeting, appellants, in their capacity as the board, had a clear recollection of when the letter was

conducted a site inspection in the township to evaluate the setbacks for a proposed building site involving Richard Samuelson. Respondents did not receive notice of these special meetings.

On June 24, 2002, the Goodhue County zoning administrator sent a letter to Banks advising him that the county had denied his application for a building permit. Although the township board had unanimously voted to issue Banks a building permit in April 2002, the county informed Banks that a feedlot existed within 2,000 feet of his proposed dwelling site. Based on the county's advice, Banks applied for a variance.

Goodhue County also sent Hovel a letter on June 24, 2002. The letter informed Hovel that his feedlot, located next to Banks's property, was not in compliance with the Goodhue County ordinance because it was situated within 2,000 feet of existing dwellings on adjacent properties. The letter further advised Hovel that he could either remove the feedlot within 30 days or apply for a variance. Shortly thereafter, Ojile, on behalf of Hovel, requested and was granted a 30–day extension for consideration of Hovel's non-compliant feedlot.

On July 8, 2002, appellants, in their capacity as the board, held a special meeting to discuss the legal representation by Ojile and a proposed settlement in the Olson matter. Respondents did not receive notice of this special meeting. About two weeks later, Banks received a variance from Goodhue County to build on his property. The next day, appellant Johnson, the chairman of the township board, accompanied the Goodhue County feedlot officer to the Hovel feedlot adjacent to Banks' property. Johnson set a boundary marker stake in the ground on the edge of

discussed.

the feedlot for purposes of determining setbacks. Originally, when the township granted Banks' building permit, the distance between Banks's building site and Hovel's shed was estimated. But the stake was substantially closer to Banks's excavation site than the edge of the shed. Based on the location of the stake, Banks's building site was in violation of the township ordinance that required a one-quarter mile setback between feedlots and residences.

The board held another special meeting on July 31, 2002, to discuss the Olson matter with the Goodhue County attorney. Respondents were not sent notice of the meeting. A week later, on August 7, 2002, appellants Johnson and Mahoney convened for a regular meeting[4] where they, along with Ojile, "discussed the distance of Gary Hovel's feedlot from Bob Banks'[s] excavation site, or proposed building site, and the difference between the county and township zoning ordinances pertaining to feedlot spacing." The meeting had been rescheduled from August 14, 2002. Because the date and time of this regular meeting had been changed from August 14, to August 7, the special notice provision of the open meeting law was triggered pursuant to Minn.Stat. § 13D.04, subd. 1 (2002). However, the public notice of the change in the time and date was published in the newspaper *the day after* the meeting. Notably, a county board of adjustment meeting was to be held on August 12, 2002, at which time Goodhue County was expected to clarify and correct an administrative error in connection with Banks' variance.

At the August 12 county board of adjustment meeting, the county confirmed the grant of Banks's variance to build. Shortly thereafter, Ojile sent Banks a letter stating that Banks must comply with the township's setback ordinance, despite the fact that the county had already granted Banks a variance. The letter stated that

> the actions by the Goodhue County Board of Adjustment granting you a variance from the Hovel feedlot down to 1,160 ft. creates a problem for the [township's] zoning code. As you know, the zoning code requires that your residence be situated on the building site at least 1,320 ft. from the Hovel feedlot.

The letter further provided that because the "stake is only 1,160 ft. from your dwelling excavation ... you will be 160 ft. too close to the feedlot, according to the Township ordinance."

A special meeting was held on August 27, 2002. Respondents were in attendance at the meeting because Ojile's letter to Banks had informed him of the special meeting. At the meeting, the board voted 2–0, with Hovel abstaining, that Banks's building site violated the township zoning ordinance. The board also advised Banks that he must apply for a variance if he wished to continue building. Banks declined to apply for a variance with the township on the basis that he already had permission from the county to build, and he did not believe a variance from the township was necessary under the county's zoning laws.

On September 16, 2002, a special meeting was held to discuss the Olson matter and to retain attorney Peter Tiede to represent the township with respect to Banks's building permit. The board also voted 2–0, with Hovel abstaining, to rescind Banks's building permit and order him to stop construction. Respondents did not receive notice of this special meeting.

By October 2002, Hovel had still not complied with Goodhue County's request

4. Hovel did not attend the meeting because he was at the county fair.

and still had not filed for a variance for his feedlot adjacent to Banks' property. Similarly, Banks still refused to apply for a variance with the township. Both sides threatened legal action on the basis that the other party was not in compliance with the proper zoning ordinances and set back regulations. A special meeting was held on December 5, 2002, where appellants, in their capacity as the board, described the meeting as a "brainstorming" session where no action was taken. But the minutes reflect that the board discussed "updating the township ordinances regarding requirements for the building permit process such as requiring registered surveys and information from the Goodhue County feedlot officer." Respondents did not receive notice of this special meeting.

In June 2004, respondents sent a letter to the Minnesota Department of Administration asking the commissioner to issue an advisory opinion regarding whether appellants, in their capacity as members of the township's board, had complied with various provisions of the open meeting laws. The department subsequently issued an opinion concluding that the board had indeed violated the Minnesota Open Meeting Law on the following dates: June 15, July 8, July 31, August 7, August 27, and September 16, 2002.[5] The department further concluded that the board did not keep accurate and complete records of their postings or their minutes in 2002.

In December 2004, respondents filed four separate complaints against appellants in their capacity as members of the township board, claiming a total of eight separate violations of the Minnesota Open Meeting Law. Although not officially consolidated yet, respondents' claims were tried together in September 2005. The

district court found that appellants intentionally violated the open meeting law on eight separate occasions in 2002. The district court ordered Hovel to pay $300 for each violation, and Johnson and Mahoney to each pay $100 for each violation. The district court further ordered that appellants were to forfeit their offices immediately pursuant to Minn.Stat. § 13D.06, subd. 3 (2002). Finally, the district court reserved the issue of reasonable costs, disbursements, and reasonable attorney fees.

Appellants moved for amended findings of fact, conclusions of law, and an order for judgment. Appellants also objected to respondents' request for an award of costs, disbursements, and attorney fees in the amount of $52,000, or $13,000 for each action. The district court subsequently clarified its decision, but otherwise denied appellants' motions. The district court also awarded attorney fees in the amount of $26,000, $13,000 to each respondent. The district court concluded that $13,000 "per party" was reasonable under Minn. Stat. § 13D.06, subd. 4(a) (2002). The district court rejected respondent's contention that each respondent was entitled to $13,000 per complaint for a total of $52,000 per respondent.

In November 2005, appellants filed four appeals, an emergency motion for expedited review, and a motion for consolidation. Shortly thereafter, respondents filed a notice of review requesting a remand on the issue of attorney fees. This court denied the request for expedited review, but granted the motion for consolidation. This court also granted applications by the Association of Minnesota Counties (AMC), the Minnesota Association of Townships (MAT), the Minnesota School Board Asso-

---

**5.** The department concluded that it could not determine if the December 5, 2002 meeting violated the open meeting law.

ciation (MSBA), and the League of Minnesota Cites (LMC) for leave to file briefs as amici curiae.

### ISSUES

I. Did the district court err in concluding that appellants were subject to removal from office under Minn.Stat. § 13D.06, subd. 3 (2002)?

II. Does appellants' reliance upon township attorney Ojile's advice negate a finding of specific intent to violate the open meeting law?

III. Does Minn.Stat. § 13D.06, subd. 4 (2002), place a cap on attorney fees at $13,000 regardless of the number of actions or parties?

IV. Did the district court err in concluding that respondents were entitled to special notice of the June 17, 2002 special meeting?

V. Did the district court err in concluding that the township officials were not exempt under Minn.Stat. § 366.01 (2002) from the open meeting law when they performed a claimed site inspection?

VI. Did the district court err in concluding that appellant Hovel violated the open meeting law on August 7, 2002, when he did not attend the meeting?

VII. Did the district court err in concluding that respondents were entitled to special notice of the December 5, 2002 meeting?

VIII. Did the district court err in finding that appellant Mahoney intentionally violated the open meeting law?

IX. Are respondents entitled to attorney fees on appeal?

### ANALYSIS

#### I. Removal

█ Appellants argue that the district court erred in concluding that they were subject to removal from office under Minn. Stat. § 13D.06, subd. 3 (2002). Statutory construction is a question of law and thus fully reviewable by this court. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn. 1985).

Minnesota's open meeting law provides that:

(a) If a person has been found to have intentionally violated this chapter *in three or more actions* brought under this chapter involving the same governing body, such person shall forfeit any further right to serve on such governing body or in any other capacity with such public body for a period of time equal to the term of office such person was then serving.

(b) The court determining the merits of any action in connection with any alleged third violation shall receive competent, relevant evidence in connection therewith and, upon finding as to the occurrence of a separate third violation, unrelated to the previous violations, issue its order declaring the position vacant and notify the appointing authority or clerk of the governing body.

Minn.Stat. § 13D.06, subd. 3 (emphasis added).

Appellants contend that the underlying action does not represent "three or more actions" for purposes of triggering the removal provision in the statute. In support of their claim, appellants distinguish *Claude v. Collins*, 518 N.W.2d 836 (Minn. 1994), from the present case based upon the subsequent legislative history surrounding the amendment to the statute that sets forth the requirements necessary

for removal of a public official from office.[6] Appellants assert that based upon the plain language of section 13D.06, and the legislative history of that statute, there must be three separate "actions" or "adjudications" before a public official can be removed from office.

In *Claude*, citizens of Hibbing brought suit against city council members, alleging that the city council held closed meetings in violation of the open meeting law. 518 N.W.2d at 838–40. The district court fined the council members for intentional violation of the open meeting law, but refused to remove any of them from office because the court believed removal was a harsh remedy never previously imposed. *Id.* at 840. This court affirmed in part, and the Minnesota Supreme Court granted further review. *Id.* at 840–41. The supreme court held that "[o]nce an official commits three separate, unrelated, and intentional violations, [Minn.Stat. § 471.705, subd. 2] mandates removal. The statute does not require, nor do any public policy considerations suggest, three separate adjudications. One adjudication of three separate, unrelated, and intentional violations is sufficient for removal under the statute." *Claude*, 518 N.W.2d at 842. Thus, the court held that the officials, who were aware of the open meeting law requirements, but engaged in at least three separate, intentional, and unrelated violations, had to be removed from office. *Id.* at 843.

While *Claude* was pending, the legislature amended section 471.705, subd. 2. The pre–1994 statute read, in pertinent part:

Any person who violates subdivision 1 shall be subject to personal liability in the form of a civil penalty in an amount not to exceed $100 for a single occurrence. An action to enforce this penalty may be brought by any person in any court of competent jurisdiction where the administrative office of the governing body is located. Upon a third violation by the same person connected with the same governing body, such person shall forfeit any further right to serve on such governing body or in any other capacity with such public body for a period of time equal to the term of office such person was then serving. The court determining the merits of any action in connection with any alleged third violation shall receive competent, relevant evidence in connection therewith and, upon finding as to the occurrence of a separate third violation, unrelated to the previous violations issue its order declaring the position vacant. . . .

Minn.Stat. § 471.705, subd. 2 (1992). The 1994 amended provision states, in pertinent part, that:

Any person who intentionally violates this section shall be subject to personal liability in the form of a civil penalty in an amount not to exceed $300 for a single occurrence, which may not be paid by the public body. An action to enforce this penalty may be brought by any person in any court of competent jurisdiction where the administrative office of the governing body is located. *If a person has been found to have intentionally violated this section in three or more actions brought under this section involving* the same governing body, such person shall forfeit any further right to serve on such governing body or in any other capacity with such public body for a period of time equal to the term of office such person was then serving. The court determining the merits of any action in connection with

---

6. The statute at issue in *Claude*, Minn.Stat. § 471.705, subd. 2 (1992), was recodified in 2000 as Minn.Stat. § 13D.06 (2000), the statute at issue herein.

any alleged third violations shall receive competent, relevant evidence in connection therewith and, upon finding as to the occurrence of a separate third violation, unrelated to the previous violations issue its order declaring the position vacant. . . .

Minn.Stat. § 471.705, subd. 2 (1994) (emphasis added).

The legislative action altered the 1992 statute in two ways. First, it added the word "intentionally" to mandate that an intentional violation of the open meeting law is now required before a civil penalty may be imposed. Second, the phrase "[i]f a person has been found to have intentionally violated this section in *three or more actions* brought under this section involving" was added.

The term "action" denotes a judicial proceeding. Minn.Stat. § 645.45(2) (2002) (defining "action" as any in-court proceeding). Appellants argue that, based on the language that was added in 1994 to remove a public official from office under the open meeting law, the official must be found to have intentionally violated the law in three separate or successive proceedings. Conversely, respondents argue that the phrase "three or more actions" does not mean three "separate" or "successive" court proceedings. Rather, respondents assert that the language "three or more actions" is satisfied here because they filed four separate complaints.

"When interpreting a statute, we first look to see whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Am. Family Ins. Group v. Schroedl,* 616 N.W.2d 273, 277 (Minn.2000) (quotation and citation omitted). Words and phrases in a statute are construed according to rules of grammar and according to their common and ap-

proved usage. Minn.Stat. § 645.08(1) (2002). "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature. Every law shall be construed, if possible, to give effect to all its provisions." Minn. Stat. § 645.16 (2002). When the words of a statute are ambiguous, we attempt to ascertain the intention of the legislature by considering, inter alia, the object of the statute, the consequences of a particular interpretation, and the legislative history. *See id.* Because both parties here have offered reasonable interpretations, we conclude that the statute is ambiguous.

At a Senate Data Privacy Subcommittee meeting on March 28, 1994, Mayor Collins, one of the defendants in *Claude,* testified as to his perspective of the bill to amend the open meeting law to require three separate adjudications of the open meeting law before a public official can be removed from office. Specifically, Mayor Collins testified that:

Right now the Supreme Court is going to hear the [*Claude* ] matter, what, whether or not we should be removed from office. There are over three violations. Now our attorney is claiming that the removal from office clause is not constitutional. I think that if the law read that you had to have three separate adjudications, that would make more sense, but it allows somebody to just wait until you have three alleged violations and then try to enforce the removal from office clause. Even in drunk driving, you have to have separate adjudications before they finally invoke a jail term on you. . . .

After Mayor Collins testified, the subcommittee thoroughly discussed the matter. Initially, there appears to have been some confusion regarding what constitutes "three separate actions," with the subcommittee debating whether to use the term

"adjudication." But as the discussion concluded, Senator Betzold clarified the matter by stating: "[the language] does identify that you have to have three or more actions brought under this section so somebody has to bring an action three different times in order to get to the remedy of having somebody forfeit their office." The motion to amend the language of the statute subsequently passed.

■ As we read the intent of the legislature, we conclude that the legislature specifically intended that in order to remove a public official under the open meeting law, the official must have been found to have intentionally violated the law in three separate proceedings. The offending official is entitled to know that what they claim they thought was allowable—was not. Once there has been an adjudication, it makes sense that if there was a second adjudication, there cannot be an excuse for the third. The nexus between the former open meeting law, *Collins,* and the amended open meeting law is persuasive. The legislature's view of public policy was that the public official had to have been tried and told that what he did was wrong before subsequent allegations could be counted up to three and trigger removal from office.

Here, there were four separate complaints filed, but they were tried together with the district court's adjudication seriatim. This method did not give appellants the opportunity to correct their mistake because they went into one hearing with four separate alleged violations and to each count they asserted good faith. They lost all four counts, essentially at the same time. We understand judicial economy and the burden of trying each complaint separately. But it appears inescapable that "separately" was the legislative intent. There has to be separate adjudications.

There is nothing in the record to indicate that the district court sat down with the parties and their attorneys and explained that the complaints were being tried together for judicial economy, but would constitute four separate adjudications for removal. That would have given the attorneys the chance to object and insist on separate trials. We will not speculate as to what the district court would have done with that objection. But at least the record would be clear and appellants would have fully understood their exposure by going through one hearing and facing four simultaneous adjudications. By definition, one consolidated trial would prevent the losers from finding out that what they thought was proper—was improper. Thus, the officials would have had no chance before the next private meeting to change it to one that would conform to the open meeting law, as defined (adjudication) by a district court.

Appellants could argue that the topics at the meetings were not unrelated but rather were related, and, therefore, removal was not justified because there were not three violations that were unrelated. But this is not a viable argument. If the topics discussed at the meetings had to be unrelated to the topics discussed at a previous meeting, there would be complete immunity to violate the open meeting law as long as the "same topics" were discussed at subsequent meetings. You could be fined but never removed for three, or five, or ten successive and intentional violations as long as the topics that were discussed were related! That interpretation of section 13D.06, subd. 3, would produce an absurd result. Minn.Stat. § 645.17 (2002) (stating that it is presumed that the legislature does not intend an absurd result). An argument that removal was improper because the open meeting law violations here were related fails.

Minn.Stat. § 13D.06, subd. 3, requires a finding of intentional open meeting law violations in three separate actions. We conclude the district court erred in ordering the removal of appellants from their positions as township board members. All other penalties and sanctions assessed by the district court against appellants were proper.

## II. Good faith reliance

Appellants argue that their reliance on township attorney Ojile's advice regarding compliance with the open meeting law should negate a finding of intentional violation of the open meeting law. Based on the unique circumstances of this case, we disagree.

The open meeting law provides that "[n]o monetary penalties or attorney fees may be awarded against a member of a public body unless the court finds that there was a *specific intent* to violate this chapter." Minn.Stat. § 13D.06, subd. 4(d) (2002) (emphasis added). Specific intent requires that an individual act with the intent to produce a specific result. *State v. Compassionate Home Care, Inc.*, 639 N.W.2d 393, 397 (Minn.App.2002). Determining a party's intent is a question of fact, and this court will not disturb the district court's determination unless it was clearly erroneous and unsupported by reasonable evidence. *See Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 102 (Minn. 1999).

Here, the record reflects that the township clerk and the township attorney advised the board that the March 12 letter did not trigger the special notice provision in the open meeting law. Appellants all testified that they relied on Ojile's advice, as the township's attorney, in deciding not to issue special notice to respondents. The district court, however, found that appellants intentionally violated the open meeting law, and that "any reliance on Attorney Ojile's legal advice on this issue was not reasonable or in good faith considering Mr. Ojile's obvious conflict of interest."

Appellants, along with amici curiae, vigorously argue that public policy dictates that government officials must be entitled to rely on the advice of the municipality's attorney and administrator. Appellants assert that the district court's decision sends a dangerous message that public officials may not be able to escape liability for a decision made in full reliance on the advice of the municipality's attorney. The AMC argues that board members are often laypeople, with no formal legal training, and the district court's decision essentially mandates that a township board must discern if the attorney's advice is good advice, bad advice, accurate, inaccurate, or tainted by an ethical conflict of interest.

We acknowledge that sound public policy mandates that in the course of their civic duties, public officials must be able to rely on competent legal advice without the threat of legal repercussions. Indeed, the Minnesota Constitution limits the removal of elected officials from office unless the official is shown to have committed "malfeasance or nonfeasance in the performance of [his] duties." Minn. Const. art. VIII, § 5. Nevertheless, at some point there is a line where, if crossed, a public official's reliance on the attorney's advice is no longer reasonable. Although sound public policy mandates that public officials must be able to rely on competent legal advice, we also acknowledge that sound public policy mandates that public officials should not be able to hide behind their "reliance" on the legal advice when there are specific facts showing that such reliance was clearly unreasonable.

The specific facts presented here demonstrate that appellants' reliance on attorney Ojile's legal advice was not reasonable. The record reflects that appellants were aware of the March 12, 2002 request for notice. Appellants relied on Ojile's advice that respondents were not entitled to special notice. Appellants relied on this advice despite the fact that feedlots and setback requirements were a "hot topic" in the township of Cannon Falls. The record reflects that residential building in certain sections of the township was very limited and one way to preserve a landowner's building rights was to register his or her lot as a feedlot so that setback requirements limited an adjacent landowner from exercising the landowner's right to build. Appellants were aware of the feedlot and setback requirements and the record reflects that Hovel and Ojile registered their land as feedlots despite the fact that the property housed a minimal amount of livestock. The record reflects that Hovel convinced his neighbors, the Albers, to register their lot as a feedlot even though the Albers owned only a few horses. The logical inference from this evidence is that Hovel was attempting to preserve his right to build, which, effectively, came at respondents' expense.

Further evidence that appellants' reliance on Ojile's legal advice was unreasonable is reflected by Ojile's personal representation of the Hovels. Ojile was aware of a potential conflict because the issue was raised during the June meetings. This fact should have put appellants on notice that their reliance on Ojile's advice may be unreasonable, especially in light of the conflicted circumstances Ojile was in. Ojile did eventually resign due to the conflict between his representation of the Hovels and his position as township attorney. The record shows that at times Ojile appeared to be as much a business partner of appellants as a township attorney. The unreasonableness of appellants' reliance on Ojile's advice is highlighted by respondents' repeated confrontations with appellants over the lack of notice of special meetings.[7]

Appellants assert that they, along with most public officials, lack experience and training in the interpretation of the open meeting law, making their reliance on counsel's advice so important. Appellants argue that an affirmance of the district court's decision would start this state down the slippery slope of litigating decisions made by public officials, even though the officials who made the decisions relied on the advice of competent legal counsel.

Appellants are correct that courts are mindful of a public official's need to freely rely on the advice of legal counsel. The supreme court in *Claude* noted that public officials are often inexperienced in the complexities of the open meeting law, and that "[i]gnorance due to inexperience may

---

7. Appellants also rely on *Mankato Free Press Co. v. City of N. Mankato*, No. C9–98–677, 1998 WL 865714 (Minn.App. Dec. 15, 1998), *review denied* (Minn. Feb. 24, 1999), to support their position that a public official who relies on the advice of legal counsel, is not liable under the open meeting law. The facts of *Mankato Free Press* are readily distinguishable from the facts presented here. In *Mankato Free Press*, this court held that because the respondents took steps to confirm the legality of the legal process, which included seeking the advice of the city attorney, the appellants were unable to show that respondents manipulated the law. *Mankato Free Press*, 1998 WL 865714, at *3. But, unlike *Mankato Free Press*, the record here reflects that appellants relied on Ojile's advice for the specific purpose of benefiting themselves at the expense of respondents. Simply stated, the facts in *Mankato Free Press* reflect that the reliance on the city attorney's legal advice was reasonable. The facts presented here demonstrate that appellant's reliance on the advice of legal counsel was not reasonable.

constitute good faith and amount to sufficient excuse where the elected official neither knows or has reason to know that he or she is violating the Open Meeting Law." 518 N.W.2d at 843 (noting that public officials should seek the advice of legal counsel to avoid violations of the open meeting law when they are inexperienced or ignorant of the law). But, the court also noted that "the excuse of inexperience very quickly wears thin." *Id.*

What is stressed here are the specific facts of this case. We conclude that appellants' reliance on township attorney Ojile's advice regarding compliance with the open meeting law was not reasonable and, thus, does not negate the district court's finding of an intentional violation of the open meeting law.

### III. Attorney fees

▮ Appellants argue that the district court's award of attorney fees was erroneous because Minn.Stat. § 13D.06, subd. 4(a) limits the award to $13,000 total, not $13,000 "per party." Conversely, respondents filed a notice of review requesting that this court clarify Minn.Stat. § 13D.06, subd. 4(a), and hold that the statute permits an award of $13,000 in attorney fees per party, per action.

▮ Generally, an award of attorney fees is reviewed for an abuse of discretion. *See Mut. Serv. Cas. Ins. Co. v. Midway Massage, Inc.,* 695 N.W.2d 138, 143 (Minn. App.2005), *review denied* (Minn. June 14, 2005). But here, the issue involves the statutory interpretation of Minn.Stat. § 13D.06, subd. 4(a). Accordingly, the standard of review is de novo. *See Hibbing Educ. Ass'n,* 369 N.W.2d at 529 (statutory construction is a question of law).

The open meeting law provides that: "In addition to other remedies, the court may award reasonable costs, disbursements, and reasonable attorney fees of up to $13,000 to any party in an action under this chapter." Minn.Stat. § 13D.06, subd. 4(a). As noted above, an action is defined as an "in-court proceeding." Minn.Stat. § 645.45(2). Because there was only one "in-court proceeding" here, respondents are not entitled to $13,000 per complaint that was filed.

▮ Appellants argue that the district court erred in awarding each respondent $13,000 in attorney fees under Minn. Stat. § 13D.06, subd. 4(a), because the statute limits the attorney fees award to $13,000 total. We disagree. The statute states that a court may award "up to $13,000 to any party in an action under this chapter." Minn.Stat. § 13D.06, subd. 4(a). The statute does not limit the attorney fees award to a one-time cap of $13,000 regardless of how many parties there are in the lawsuit. It is settled that a suit may be brought by more than one party. *See Vaubel Farms, Inc. v. Shelby Farmers Mut.,* 679 N.W.2d 407, 411 (Minn. App.2004) (defining "suit" as "any proceeding by a party or parties against another in a court of law").

Here, respondents Brown and Banks were separate plaintiffs in the suit against appellants. Because section 13D.06, subd. 4(a) provides the district court with discretion to award $13,000 in attorney fees to "any party" under the open meeting law, the district court was within its discretion when it awarded $13,000 in attorney fees to each respondent.

### IV. Special notice

▮ Appellants argue that the district court erred in concluding that respondents were entitled to special notice of the June 17, 2002 special meeting. On appeal, a district court's findings of fact are given great deference and will not be set aside unless they are clearly erroneous. *Fletcher,* 589 N.W.2d at 101. "Findings of fact are clearly erroneous only if the reviewing

court is 'left with the definite and firm conviction that a mistake has been made.' " *Id.* (quoting *Gjovik v. Strope,* 401 N.W.2d 664, 667 (Minn.1987)).

 The open meeting law provides that "[a] person filing a request for notice of special meetings may limit the request to notification of meetings concerning particular subjects, in which case the public body is required to send notice to that person only concerning special meetings involving those subjects." Minn.Stat. § 13D.04, subd. 2(d) (2002). The open meeting law is designed to avoid secret meetings, to allow the public to be informed about public officials' decision-making, and to allow members of the public to present their views to their public officials. *St. Cloud Newspapers, Inc. v. Dist. 742 Cmty. Sch.,* 332 N.W.2d 1, 4 (Minn.1983). The open meeting law was enacted for the public benefit and must be given a liberal construction in the public's favor. *Claude,* 518 N.W.2d at 841.

Appellants argue that respondents were not entitled to special notice of the June 17, 2002 special meeting because the meeting involved a discussion related to Ojile's representation of both the Hovels personally and the township board in relation to the Olson matter. Appellants claim that because the board's discussion was only "tangentially related" to respondents' request for notice, the district court's finding of an intentional violation of the open meeting law related to the June 17, 2002 meeting was clearly erroneous.

Respondents' March 12, 2002 letter requested notice of any special meetings that addressed the following topics: (1) feedlot permits and setbacks from residential properties; and (2) feedlot permits issued with Cannon Falls' urban expansion district or within two miles of city limits. The record reflects that the Olson matter concerned litigation over the revocation of a building permit due to the existence of Hovels' feed lot. Construing respondents' request for notice liberally, the discussion at the June 17, 2002 meeting concerned feedlot permits and setbacks from residential properties. Accordingly, the district court did not err in concluding that respondents were entitled to special notice of the June 17, 2002 meeting.

## V. Exemptions

 Appellants argue that because the June 19, 2002 special meeting took place at the Samuelson property to do an onsite inspection of the proposed building site, they are exempt from the open meeting law under Minn.Stat. § 366.01, subd. 11 (2002). This statute provides:

> **Open Meeting Law; exemption.** Chapter 13D does not apply to a gathering of town board members to perform on-site inspections, if the town has no employees or other staff able to perform the inspections and the town board is acting essentially in a staff capacity. The town board shall make good faith efforts to provide notice of the inspections to each news medium that has filed a written request for notice if the request includes the news medium's telephone number. The notice shall be given by telephone or by any other method used to notify the members of the public body.

Minn.Stat. § 366.01, subd. 11.

The record reflects that appellants, in their capacity as the town board, met at the Samuelson property to do an onsite inspection. But the record also reflects that the meeting constituted a "special meeting." Mahoney admitted that the board discussed the distance between an existing feedlot and a proposed building site at the June 19, 2002 meeting. Based on their previous request for notice, and the subject matter discussed at the meet-

ing, respondents were entitled to notice of the meeting. Because the June 19, 2002 meeting served the dual purpose of an onsite inspection *and* a special meeting, appellants were not exempt from the open meeting law under section 366.01, subd. 11.

### VI. Attendance

■ Appellants argue that because Hovel did not attend the August 7, 2002 meeting, the district court erred in finding that Hovel violated the open meeting law on that date. In support of their claim, appellants cite *Brainerd Daily Dispatch v. Dehen,* where this court noted that a certain council member was not sued because he did not attend a closed meeting. 693 N.W.2d 435, 438 n. 1 (Minn.App.2005), *review denied* (Minn. June 14, 2005). Appellants assert that because *Dehen* indicates that attendance at a meeting is necessary in order to constitute an open meeting law violation, Hovel's absence from the August 7, 2002 meeting exempts him from liability.

*Dehen* does not hold that attendance at a meeting is required in order to constitute an open meeting law violation. Rather, in *Dehen*, this court simply noted, in the fact section, that a certain council member was not sued after he declined to attend a closed meeting. *Id.* Most importantly, the council member in *Dehen* consciously avoided the meeting due to concerns it was not permitted by the open-meeting law. *Id.* That is not our facts.

Here, nothing in the record indicates that Hovel avoided the meeting out of concern that the meeting might violate the open meeting law. In fact, the record reflects that Hovel was aware of the meeting change and intentionally agreed to the meeting without notice to the public or to respondents. In other words, Hovel was instrumental in arranging a meeting that violated the open meeting law. Hovel simply did not attend the meeting because he went to the county fair. The district court

did not err in finding that Hovel's absence from the August 7 meeting did not exempt him from liability.

### VII. What is a meeting?

■ Appellants argue that the district court erred in concluding that respondents were entitled to special notice of the December 5, 2002 meeting because the meeting was simply a "brainstorming" session that did not trigger any special notice. We disagree. The minutes of the December 5 meeting reflect that: "The board discussed updating the township ordinances regarding requirements for the building permit process such as requiring registered surveys and information from the Goodhue County feedlot officer." Construing respondents' request for notice liberally, the meeting involved feedlot permits and setbacks from residential properties. *See Claude,* 518 N.W.2d at 841. In light of respondents' repeated requests for notice of special meetings regarding discussions of feedlot permits and setback requirements, and appellants' admission that they failed to send respondents notice of any of the special meetings, the district court did not err in concluding that respondents were entitled to notice of the December 5 meeting.

### VIII. Intent

■ Appellants argue that the district court's finding that Mahoney intentionally violated the open meeting law is clearly erroneous because: (1) Mahoney testified that he was unaware of respondents' request for special notice until January 2003; and (2) the district court's finding that respondents' request for notice was discussed during the June 2002 meetings is unsupported by the record. But the record reflects that according to Ojile's billing records, Ojile reviewed the open meeting rules on June 14, 2002, two days after the June 12, 2002 meeting and three days be-

fore the June 17, 2002 meeting. As the district court found, Ojile's billing records indicate that respondents' letter was discussed at either the June 12 or June 17 meeting, or both. Mahoney was present for both meetings. Although Mahoney testified that he did not become aware of respondents' March 12 letter until January 2003, the district court apparently did not find his testimony to be credible. *See* Minn. R. Civ. P. 52.01 (stating that due regard is given to the opportunity of the district court to judge the credibility of the witnesses). Conveniently, there are no minutes of when respondents' March 12 letter was discussed, and appellants were unable to recall when the letter was addressed. In light of the unique circumstances of the case, we conclude that the record supports the district court's finding that Mahoney intentionally violated the open meeting law.

## IX. Appellate fees

Respondents request the recovery of attorney fees on appeal in the amount of approximately $25,000. An appellate court may award attorney fees when the appeal is frivolous or in bad faith. *Brett v. Watts*, 601 N.W.2d 199, 202 (Minn.App.1999), *review denied* (Minn. Nov. 17, 1999). Fees may also be recovered if specifically authorized by contract or statute. *Van Vickle v. C.W. Scheurer & Sons, Inc.*, 556 N.W.2d 238, 242 (Minn. App.1996), *review denied* (Minn. Mar. 18, 1997). "The award of attorney fees on appeal rests within the broad discretion of the appellate court." *Id.*

Respondents argue that Minn. Stat. § 13D.06, subd. 4, authorizes a separate award of attorney fees on appeal, in addition to any award of fees granted by the district court. The open meeting law provides that: "In addition to other remedies, the court may award reasonable costs, disbursements, and reasonable attorney fees of up to $13,000 to any party in an action under this chapter." Minn.Stat. § 13D.06, subd. 4(a). Based on the plain language of the statute, section 13D.06, subd. 4(a), caps the amount of attorney fees that can be awarded to a party pursuant to the open meeting law at $13,000. The district court awarded each respondent $13,000 in attorney fees at the district court level (which we affirm). It is a case of first impression whether the language of the open meeting law allows each respondent additional attorney fees *on appeal*, when the district court attorney fees award hit the maximum. Both sides make reasonable arguments for their respective positions. We conclude the better course, at least for now, is to say, "A cap is a cap is a cap." Thus, since each respondent has received the maximum allowed by statute at the district court level, we do not award respondents any additional attorney fees on appeal. Also, by definition, our decision, which reverses the removal of appellant from office, means that appellants' appeal was not frivolous, and was not brought in bad faith,

## DECISION

Under the Minnesota Open Meeting Law, as amended, a public official must have been found to have intentionally violated the open meeting law in three separate proceedings before the official is subject to removal from office. Because the district court's order here constitutes only one adjudication of an open meeting law violation involving multiple counts, the district court erred by ordering the removal of appellants from office. All other sanctions were proper.

**Affirmed in part and reversed in part; motion for attorney fees denied.**