**Rundell FLETCHER, Respondent,**

v.

**ST. PAUL PIONEER PRESS, d/b/a Northwest Publications, Inc., Appellant.**

**No. C3–97–1765.**

Supreme Court of Minnesota.

Feb. 25, 1999.

**98**

Carol A. Ellingson, Bend & Ellingson, P.A., Laura J. Davis, Employee Relations/Labor Counsel, St. Paul, for appellant.

Stephen Cooper, Kathryn J. Cima, Cooper Law Firm, Chartered, Minneapolis, for respondent.

## OPINION

GILBERT, J.

This case arises out of an employment discrimination claim under the Minnesota Human Rights Act (MHRA), Minn.Stat. § 363.03, subd. 7 (1998). Following a bench trial, the trial court entered judgment in favor of the appellant, St. Paul Pioneer Press (Pioneer Press), finding that the Pioneer Press had not intentionally discriminated against the respondent, Rundell Fletcher. Fletcher appealed to the court of appeals, which disagreed with the trial court's findings and conclusions, and reversed. We conclude that the trial court's findings were not clearly erroneous and support the trial court's conclusions, and therefore reverse and remand for reinstatement of the trial court's judgment.

The facts giving rise to this lawsuit are largely undisputed. The Pioneer Press hired Fletcher as a journeyman pressman in January of 1988. During the hiring process, Fletcher falsified his application and submitted a false resume. Fletcher, in fact, was not qualified to work as a journeyman pressman, a union position. Upon learning that Fletcher was not a qualified journeyman pressman, the Pioneer Press demoted Fletcher to the position of apprentice, yet continued to compensate Fletcher at the full rate of a journeyman.

In 1990, Fletcher, still an apprentice, was laid off pursuant to the Pioneer Press' collective bargaining agreement. During this lay-off, Fletcher became eligible for employment as a journeyman pressman. The Pioneer Press rehired Fletcher as a journeyman in January of 1991, at which time he began accruing seniority. In March of 1991, Fletcher was again laid off in accordance with the Pioneer Press' collective bargaining agreement. One year later, in March of 1992, Fletcher's right to be rehired into a journeyman position by the Pioneer Press pursuant to the collective bargaining agreement expired.

The collective bargaining agreement under which the journeymen were employed required the Pioneer Press to employ a minimum of 38 journeymen. In June of 1992, the Pioneer Press employed 38 journeymen and had no openings for additional journeymen. However, in June of 1992, the Pioneer Press created a press wiper position in the pressroom. This position paid approximately $8 per hour, in comparison with the $22 per hour earned by journeymen. In hopes that he might be considered for the next journeyman position, Fletcher, still unemployed following his lay-off from the Pioneer Press in March of 1991, applied for and accepted the position of press wiper. He was never promised the next journeyman position, but it was widely known that he anticipated being promoted into a journeyman position the next time an opening occurred. The Pioneer Press was under no obligation to either create a position for Fletcher or to hire him for any newly created or newly opened positions.

During Fletcher's employment as a press wiper, Art Miller was the assistant manager of the Pioneer Press' pressroom, and as such was responsible for supervising all pressroom employees, including the press wiper. Miller was a 25–year employee of the Pioneer Press who had been an assistant manager for approximately 10 years.

On the morning of August 20, 1992, Fletcher was working as a press wiper and was under Miller's supervision. During the shift, Fletcher was talking with two machinists regarding a problem with one of the presses. During this discussion, Miller approached the group and told Fletcher to get back to work. Miller then asked Fletcher whether Fletcher

would be at work the following day. Although Fletcher testified at trial that he calmly told Miller that he was not sure and proceeded to walk away, other witnesses testified that Fletcher responded with anger, swearing at Miller and refusing to answer Miller's question. Fletcher himself had earlier told Pioneer Press' Employee Relations personnel that he and Miller had been in a "heated" argument and were "in each other's faces." In any event, following the verbal exchange Fletcher began to walk away. Miller then said something to the effect that Fletcher had better come to work the following day or he would be fired. In a lower voice, Miller then referred to Fletcher, an African–American, as a "dumb f* * *ing n* * * *r." At trial, it was undisputed that Miller had no authority to fire Fletcher.

The two machinists with whom Fletcher had been speaking were standing approximately 2 to 4 feet from Miller and both heard Miller make the comment. Fletcher was 10 to 30 feet from Miller when the comment was made and was not sure of what he heard Miller say until a few minutes after the incident, when the machinists confirmed Fletcher's suspicions that Miller had used a racial epithet in reference to him.

Following his shift, Fletcher went to the Pioneer Press' Employee Relations office to file a complaint against Miller. Fletcher spoke to a manager and related the above events to her. Employee Relations personnel immediately began investigating Fletcher's complaint. Both machinists gave statements regarding their perceptions of the incident between Miller and Fletcher, and both confirmed that Miller had used the racial epithet in reference to Fletcher. That evening, the Vice–President of Operations, Larry Barr, telephoned Miller at home regarding the allegations. Miller denied using the racial epithet. After the conversation with Barr, Miller telephoned one of the machinists, who confirmed that Miller had indeed used the offensive term. Miller, believing that the machinist was honest and had no reason to lie, then telephoned Barr and told Barr that he must have used the term in question. Barr immediately

suspended Miller and instructed him not to contact Fletcher.

Miller testified at trial that Barr's instruction was the sole reason he did not immediately apologize to Fletcher. Miller further testified that his intention in telephoning the machinist was not to see whether the machinist would lie for him, but only to discover whether he had in fact called Fletcher the offensive name. At trial, Miller did not deny making the statement, but testified that he did not intend anyone to hear him.

The Pioneer Press' investigation included a personnel background check of Miller. Miller's personnel file and interviews conducted with his supervisors indicated that the incident with Fletcher was the sole incident or complaint of racial discrimination or racially motivated conduct on his part. The background check revealed that Miller had other interpersonal problems, such as being abrasive, but there was no indication that these problems stemmed from race. Instead, it was undisputed that Miller was harsh with all employees, regardless of race.

As a result of the incident with Fletcher, Miller was suspended for three weeks, two of which were without pay. The Pioneer Press considered placing Miller into a position unrelated to journeyman pressman duties, but decided that requiring Miller to learn an entirely new trade was not an appropriate resolution. The Pioneer Press instead demoted Miller from his supervisory position, which he had held for approximately 10 years, into a newly created 39th journeyman position. Because the 39th journeyman position was in excess of the number of positions required by the collective bargaining agreement, Miller was subject to layoffs. Further consequences of this demotion included a decrease in pay of approximately $10,000 per year, loss of 401(k) company match and withdrawal benefits, reduced pension, and loss of all seniority. The Pioneer Press also required Miller to apologize to Fletcher before he was permitted to return to work, and Miller and all other pressroom employees were obligated to attend diversity training. In early September of 1992, Miller apologized to Fletcher and returned to work as the 39th journeyman.

Pioneer Press managerial employees testified, and the trial court found, that no opening for a 39th position existed prior to Miller's demotion. Although there was extra work in the pressroom and management had discussed adding a 39th position, no decision had been finalized and thus no opening existed for the 39th position in August of 1992. The Pioneer Press was under no obligation to create the 39th position, but instead did so as a result of the conflicting business need to remove Miller from his supervisory position and the desire to retain him as an employee. Thus, it was possible that, absent Miller's demotion, no 39th position would have been created.

Nonetheless, Fletcher objected to Miller's demotion into the 39th journeyman position, claiming that it deprived him of the opportunity to apply for and occupy that position. Fletcher informed management that he believed the appropriate resolution of the matter was for Miller to be terminated and for Fletcher to be promoted into the 39th position, although Fletcher had not been promised such a promotion and had no right to such a promotion. Pioneer Press management believed that "Fletcher felt that he should be somehow rewarded by the company for what had happened." The Pioneer Press acknowledged Fletcher's feelings regarding appropriate resolution of the issue, and openly conceded that Miller's demotion "ironically preclud[ed Fletcher] from being considered" for the 39th journeyman position.

Despite Fletcher's protest, the Pioneer Press stood by its initial decision. Management felt that termination was too severe a penalty for an isolated incident of discrimination by a 25–year employee, yet also believed it would be inappropriate for Miller to continue in a supervisory position following such a serious incident of racial hostility. Fletcher himself conceded that demoting Miller would have been an appropriate resolution had Miller not been "taking [Fletcher's] job."

On September 10, 1992, management met with Fletcher to discuss his performance and attendance problems, most of which had occurred prior to the August 20 incident. The complaints regarding Fletcher's performance came from three of his supervisors: Miller, Bob Jolly and Bill DeRose. At trial, there was testimony that management had intended to meet with Fletcher to discuss these problems on August 21, 1992, but that the meeting was postponed due to the incident between Miller and Fletcher. The September 10th meeting constituted an "oral warning," and had no detrimental effect on Fletcher's employment. Although one of the theories presented at trial was that this meeting constituted retaliation, Fletcher himself testified that his sole complaint of retaliation was Miller's demotion, an action that Fletcher conceded would have been appropriate but for the fact that Miller was given "[Fletcher's] job."

Fletcher continued to work as a press wiper until December 1992, when he was absent due to a work-related injury. This absence continued until June 1993, at which time the Pioneer Press hired Fletcher as the 40th journeyman. He was again laid off in November 1993, pursuant to the collective bargaining agreement. Fletcher was again rehired in May 1994. In November 1995, the Pioneer Press terminated Fletcher's employment for reasons unrelated to this action. Fletcher does not assert that the 1993 lay-off or his termination was discriminatory or retaliatory.

In 1994, Fletcher filed suit against the Pioneer Press, alleging hostile work environment, negligent supervision, and racial harassment and discriminatory reprisal in violation of the MHRA. The trial court granted summary judgment on all claims, but the court of appeals reversed and remanded for trial on the hostile environment and reprisal claims. *Fletcher v. St. Paul Pioneer Press,* No. C7–95–2, 1995 WL 379140 (Minn.App. June 27, 1995), *pet. for rev. denied* (Minn., Aug. 30, 1995), *pet. for rev. denied* (Minn. Oct. 10, 1995).

Following a bench trial, the trial court concluded that there was "no merit to [Fletcher's] complaint" and held in favor of the Pioneer Press on all claims. The trial court concluded that Fletcher had failed to prove a racially hostile environment, based on its finding that the sole allegation of racial harassment was the single comment by Mil-

ler. As to the reprisal claim, the trial court concluded that Fletcher failed to prove a prima facie case because Miller's demotion did not constitute adverse employment action against Fletcher, since Fletcher had no right to the 39th journeyman position. Additionally, the trial court concluded that Fletcher failed to satisfy his ultimate burden of proving that the Pioneer Press intentionally discriminated against him by demoting Miller.

The trial court denied Fletcher's motion for amended findings of fact and conclusions of law or, alternatively, a new trial, and Fletcher appealed. The court of appeals affirmed the trial court's conclusion that Fletcher failed to prove a hostile environment, finding that the record adequately supported the trial court's conclusion. In affirming the trial court, the court of appeals stated that the Pioneer Press "took appropriate and timely remedial action after learning of the incident with Miller." *Fletcher v. St. Paul Pioneer Press*, No. C3–97–1765, 1998 WL 218193 at *3 (Minn.App. May 5, 1998), *pet. for rev. granted* (Minn., July 28, 1998). However, the court of appeals "disagreed" with the trial court's conclusion with respect to the reprisal claim. The court of appeals held that because Miller's demotion into the 39th journeyman position precluded Fletcher's opportunity for promotion to that position, Miller's demotion constituted adverse employment action against Fletcher. *Id.* at *2. The court of appeals noted that the Pioneer Press knew Fletcher wanted the next journeyman position yet still demoted Miller into that position, and thus the court of appeals determined that "the trial court erred by concluding that [Fletcher] failed to prove that [the Pioneer Press'] disciplinary action against Miller was a pretext for discrimination against [Fletcher]." *Id.* at *3. On this basis, the court of appeals concluded "that [the Pioneer Press'] action in demoting Miller into a journeyman position, thereby forestalling [Fletcher's] opportunity for advancement, constitutes unlawful reprisal discrimination." *Id.* at *4. The court of appeals therefore reversed and remanded to the trial court. *Id.*

We note that the court of appeals' holding with respect to the hostile environment claim is clearly at odds with the reversal of the reprisal claim. While the court of appeals held that the record supported the trial court's conclusion that the demotion of Miller into the 39th journeyman position was an appropriate remedial action, the court of appeals nonetheless held that the demotion constituted intentional and discriminatory reprisal against Fletcher. Fletcher did not appeal the court of appeals' holding with regard to the hostile environment claim. Therefore we need not address that issue. However, we must address the issue of employer liability for intentional and discriminatory reprisal resulting from appropriate remedial action.

It is not the province of this court to reconcile conflicting evidence. On appeal, a trial court's findings of fact are given great deference, and shall not be set aside unless clearly erroneous. Minn. R. Civ. P. 52.01. Findings of fact are clearly erroneous only if the reviewing court is "left with the definite and firm conviction that a mistake has been made." *Gjovik v. Strope*, 401 N.W.2d 664, 667 (Minn.1987). If there is reasonable evidence to support the trial court's findings of fact, a reviewing court should not disturb those findings. *See State v. Danh*, 516 N.W.2d 539, 544 (Minn.1994).

The MHRA prohibits intentional reprisal against an employee who has engaged in statutorily protected activity, such as filing a discrimination complaint. Minn. Stat. § 363.03, subd. 7. In construing the MHRA, we apply law developed in federal cases arising under Title VII of the 1964 Civil Rights Act, 42 U.S.C. §§ 2000e–2000e–17 (1994). *See Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 441 (Minn.1983). To determine whether a violation of the MHRA has occurred, we use the three-part test established by the United States Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Hubbard*, 330 N.W.2d at 444. Under the *McDonnell-Douglas* test, the employee-plaintiff has the initial burden of establishing a prima facie case of discrimination. *McDonnell-Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. 1817. In the context of a discriminatory reprisal claim, a prima facie case is established by showing by

a preponderance of the evidence: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." *Hubbard,* 330 N.W.2d at 444.

Once the employee has established a prima facie case, the burden shifts to the employer to articulate a legitimate and non-discriminatory reason for the adverse employment action. *McDonnell-Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817. Upon articulation of a legitimate and non-discriminatory reason for the adverse employment action, the burden shifts back to the employee to show that the proffered reasons were not the true reason for the action, but were instead a pretext for discrimination. *Id.* at 804, 93 S.Ct. 1817.

However, following a full trial on the issue of retaliation, "the three-part [*McDonnell-Douglas*] test drops from the case, and the district court must only decide whether the employer intentionally discriminated or retaliated against the employee." *Maness v. Star–Kist Foods, Inc.,* 7 F.3d 704, 707 (8th Cir.1993); *see also St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Thus, on appeal we need only determine whether the trial court was clearly erroneous in finding that the Pioneer Press did not intentionally discriminate against Fletcher. *See Maness,* 7 F.3d at 707–08.

The trial court found that the Pioneer Press had legitimate and non-discriminatory reasons for demoting Miller into the journeyman position. The trial court further found that the Pioneer Press demoted Miller not to intentionally discriminate or retaliate against Fletcher, but instead out of a genuine desire to address Miller's inappropriate actions in a prompt and effective manner. The trial court so found despite the Pioneer Press' admitted knowledge of the adverse effect that Miller's demotion would have on Fletcher, who sought promotion into a journeyman position. These findings were supported by testimony of Pioneer Press employees, whom the trial court specifically found to be credible. Indeed, the court of appeals affirmed the trial court's findings

that the demotion of Miller, a 25–year employee with no prior incidents of racial hostility in his personnel file, was an appropriate remedial action. The record supports the trial court's finding that the Pioneer Press did not intentionally discriminate against Fletcher.

The court of appeals did not hold these findings to be clearly erroneous, but instead reversed based on mere disagreement with the findings and the resulting conclusion. An appellate court may not reverse a trial court due to mere disagreement with its findings. *See* Minn. R. Civ. P. 52.01. Rather, we will reverse a lower court's findings of fact only when those findings are clearly erroneous. *Id.* Findings of fact are considered clearly erroneous only if they are not reasonably supported by the evidence. *Id.* Here, the trial court's findings had substantial support in the evidence. We therefore conclude that the trial court's findings were not clearly erroneous and reverse and remand for reinstatement of the trial court's original judgment in favor of the Pioneer Press.

Reversed and remanded.

PAGE, Justice (dissenting).

I respectfully dissent. The court concludes that an employment action taken by an employer to discipline the perpetrator of racially discriminatory behavior that results in adverse consequences for the victim of that behavior does not violate the MHRA. That seems wrong to me. By permitting an employer responding to an employee's legitimate complaint of race discrimination to place the victim in a worse position than if he or she had not complained, the court allows the very discrimination the MHRA was intended to eradicate. The court should not put its stamp of approval on such a practice.