In the Matter of the REVOCABLE
TRUST OF Naomi
MARGOLIS.

No. A06–1018.

Court of Appeals of Minnesota.

May 22, 2007.

Bruce C. Recher, Richelle M. Wahi Reif, Henson & Efron, P.A., Minneapolis, MN, for appellant Barry Lorberbaum.

Grant R.J. Lindquist, David M. Jacobs, P.A., Minneapolis, MN, for respondent Jack Margolis.

Considered and decided by MINGE, Presiding Judge; STONEBURNER, Judge; and WRIGHT, Judge.

## OPINION

MINGE, Judge.

Appellant-co-beneficiary of a trust challenges the district court's affirmation of

respondent-co-trustee's accounting. Appellant argues that respondent's use of trust funds to pay for the beneficiary's medical care was barred by Minn.Stat. § 501B.14 (2006) and that by using trust funds in this way, respondent breached fiduciary duties. Appellant also maintains that the court clearly erred in finding that a $100,000 Norwest certificate of deposit (CD) was not trust property. Because the district court did not clearly err in finding that the Norwest CD was not trust property, we affirm that finding. But because the district court erred in its interpretation and application of Minn.Stat. § 501B.14, we reverse that portion of the decision. And because the district court did not adequately consider appellant's breach-of-fiduciary-duty claims, we remand for consideration of those claims, the appropriate remedy, and possible damages.

## FACTS

Respondent Jack Margolis[1] and Naomi Margolis married in 1979. Both had been married previously, and both had children from their prior marriages. Appellant Barry Lorberbaum is one of Naomi's two children. Respondent brought greater wealth to the marriage, and the couple signed an antenuptial property agreement. In 1994, Naomi executed the Naomi Margolis Revocable Trust Agreement, displacing that antenuptial agreement.[2] The terms of the trust designated respondent and Naomi as co-trustees. Respondent and Naomi also delegated to each other all of their powers as co-trustee, and Naomi executed a short-form power of attorney designating respondent as her attorney-in-fact.

Article 2 of the trust governs the use of trust property for the support of Naomi. Section 2.1 of the trust requires that during her lifetime the trust distribute to Naomi such income and principal of the trust as she may request. Section 2.2 directs that if Naomi becomes incompetent, the trustees, in their discretion, are to provide for her support, maintenance, and health. Section 6.6 confirms this power.

Articles 3, 4, and 8 of the trust govern the distribution of trust property following Naomi's death. Section 3.1 provides for the use of trust property to pay for "[Naomi]'s just debts, [and] the expenses of [Naomi]'s last illness, funeral and burial, and the expenses of the administration of [Naomi]'s estate. . . ." Section 4.1 requires the remaining trust property to be distributed to Naomi's children and grandchildren in equal shares. Section 8.1 provides that if Naomi is unable to serve as trustee and fails to designate a successor trustee, appellant is to become her successor trustee.

Although the trust agreement submitted in the record does not include a list of trust property, it is undisputed that the following assets were transferred to the trust:

> Knollwood West Partnership Interest—12.619%
>
> Rosewood Center Partnership Interest—7.5%
>
> Ridgehill Partners Partnership Interest—8.33%

---

1. Although Jack Margolis died after the district court proceeding, his death does not affect the appeal, and we refer to respondent as an individual for simplicity in discussing the case.

2. The record indicates that the trust assets had been transferred by respondent to Naomi several years prior to the creation of the trust. Respondent does not claim and the district court did not find that respondent's earlier ownership of the assets affected the merits of appellant's claims.

Northstar Bank Certificate of Deposit # 24842—$10,000

Northstar Bank Certificate of Deposit # 30740—$10,000

Northstar Bank Certificate of Deposit # 36392—$10,000

Piper Jaffray Account—beginning balance $19,316

A schedule in Naomi's handwriting also includes a Norwest CD in the amount of $100,000 in the list of assets transferred to the trust. Another note in her handwriting places respondent's name next to the $100,000 Norwest CD. From 1994 to 2000, Naomi received annual trust distributions between $5,000 and $50,000.

In 2001, Naomi's health declined. She had difficulty speaking, was unable to communicate effectively, and required assistance with physical activities. A physician advised respondent that Naomi could no longer live at their residence, and she was admitted to the Sholom Home, a long-term health-care facility. When Naomi was admitted, respondent signed an Admission Agreement with the Sholom Home. On the last page, respondent signed next to the heading "RESIDENT'S SPOUSE" and above the line which reads: "The spouse by signing above, acknowledges joint and several responsibility for payment of all charges." Naomi never signed the Agreement.

While Naomi resided at the Sholom Home, respondent used trust assets indirectly to pay for nursing-home services. Trust income was not deposited in a trust account. Rather, respondent deposited checks payable to the Naomi Margolis Revocable Trust and the proceeds from liquidation of the trust's three Northstar CD's directly into the couple's joint checking account. Respondent then drew on this joint account to make payments to the Sholom Home. According to Sholom Home records, respondent paid $194,089.85 for the uninsured cost of Naomi's care. According to respondent's accountant, respondent paid a total of $206,384 for Naomi's care in the Sholom Home and other medical expenses.

In November 2003, Naomi's death was imminent, and respondent sought legal advice to determine whether he could move the Ridgehill, Knollwood, and Rosewood partnership interests, then in Naomi's trust, to his own trust. Relying on the advice of his lawyer, respondent transferred those assets to his trust, the Jack Margolis Revocable Trust. After the conveyance, his trust received cash distributions from the partnerships. But near the end of 2004, again on the advice of his lawyer, respondent transferred the partnership interests back to the Naomi Margolis Revocable Trust. While respondent held the partnership interests in his own trust, he received $29,263.65 in partnership distributions.

Naomi died in February of 2004. She was survived by her daughter and appellant. In August 2004, appellant petitioned the district court for removal of respondent as trustee of the Naomi Margolis Revocable Trust, for his own appointment as trustee, for redress for respondent's alleged breach of fiduciary duties, and for a full accounting of the trust's income, distributions, liabilities, and expenses. The district court granted appellant's requests for respondent's removal, his appointment, and an accounting, but it deferred the fiduciary issues to a subsequent hearing. Respondent then filed an accounting.

At trial, appellant claimed that respondent improperly used trust funds to pay for Naomi's medical expenses, that respondent's accounting failed to include the $100,000 Norwest CD as trust property, and that respondent breached fiduciary

duties owed to the trust. Appellant sought restitution in the amount of $307,902.80 for the allegedly improper payment of Naomi's medical expenses ($206,-384), and the $100,000 Norwest CD. The district court concluded that all of the trust distributions were used to pay for Naomi's medical care, that the expenditures were proper, and that appellant did not meet his burden to establish that the Norwest CD was trust property. The district court did not explicitly address appellant's fiduciary duty arguments. This appeal follows.

## ISSUES

I. Did the district court err by affirming respondent's use of trust funds for Naomi Margolis's medical expenses?

II. Did the district court clearly err in finding that the $100,000 Norwest certificate of deposit was not trust property?

## ANALYSIS

### I.

Appellant contends that the district court erred by affirming respondent's accounting because: (A) respondent's distributions for Naomi's medical care violated Minn.Stat. § 501B.14 (2006); (B) respondent's handling of funds breached fiduciary duties owed to the trust; and (C) respondent breached the terms of the trust by failing to consult a medical advisor and appoint a successor trustee upon Naomi's incapacitation.

#### A. Minn.Stat. § 501B.14

The first issue is whether respondent's use of trust funds to pay for Naomi's medical services was barred by Minn.Stat. § 501B.14, subd. 1(2). In relevant part, this statute provides:

No trustee may exercise or participate in the exercise of any of the following

powers: ... (2) any power to make discretionary distributions of either principal or income to discharge any legal support or other obligations of the trustee to any person.

The interpretation and application of a statute to the undisputed facts of a case involves a question of law, and we review the district court's decision de novo. *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 892 (Minn.1996). The goal of statutory interpretation is to "ascertain and effectuate" the legislature's intent. Minn.Stat. § 645.16 (2006). "When interpreting a statute, we first look to see whether the statute's language, on its face, is clear or ambiguous. A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Am. Family Ins. Group v. Schroedl*, 616 N.W.2d 273, 277 (Minn.2000) (quotations omitted). If the statute is unambiguous, we give the language its plain meaning. *State v. J.R.A.*, 714 N.W.2d 722, 726 (Minn. App.2006), *review denied* (Minn. Aug. 23, 2006). "If the language is ambiguous, however, we may consider other factors, such as the purpose of the statute and the consequences of a particular interpretation." *In re Estate of Sullivan*, 724 N.W.2d 532, 535 (Minn.App.2006).

■ Initially, respondent argues that Minn.Stat. § 501B.14 is not applicable to this case because it was enacted solely for federal estate tax purposes. Even if the statute were prompted by estate-tax considerations, it contains no qualification or limitation regarding its application, and this claim is not an adequate reason to disregard its language. Moreover, subdivision 3 of the statute expressly governs the statute's application and states, in part:

Except as provided in paragraph (b), this section applies to any exercise of any powers of the trustee after May

14, 1993, under any trust created before, on, or after May 14, 1993, unless the terms of the trust refer specifically to this section and provide that this section does not apply.

Minn.Stat. § 501B.14, subd. 3(a). The subdivision proceeds to list four instances in which the statute does not apply to a trustee. Minn.Stat. § 501B.14, subd. 3. Respondent makes no claim that this case falls within any of the four exceptions listed in subdivision 3, and the text of the trust agreement does not reference Minn. Stat. § 501B.14 or provide that the statute does not apply. Because the reach of the statute's application is unambiguous, we do not further consider respondent's argument regarding its tax purpose.

■ The question of whether respondent's allocation of trust funds to pay for Naomi's medical care was prohibited by Minn.Stat. § 501B.14, is more difficult. Minn.Stat. § 501B.14 was enacted in 1993, and since that date, the statute has been cited in only one Minnesota case, which is not directly on point. *See Morrison v. Doyle*, 582 N.W.2d 237, 241 (Minn.1998). The question we must resolve is whether respondent "discharge[d][a] legal support or other obligation[ ] of the trustee," within the meaning of Minn.Stat. § 501B.14, by paying for Naomi's medical care with trust funds.

Respondent urges this court to construe "legal support ... obligation" as an obligation for which the trustee is *primarily* liable. According to respondent, the statute only prohibits a trustee from using trust funds to discharge a legal obligation when the obligation is *primarily* the trustee's and not also the beneficiary's. In contrast, appellant urges us to construe the phrase "legal support ... obligation" according to its plain meaning. Appellant argues that by using trust funds to pay for Naomi's medical care,

respondent unlawfully discharged his legal-support obligations pursuant to the nursing-home contract he signed and as her husband pursuant to Minn.Stat. § 519.05(a) (2006). By contract and by law, respondent was liable for Naomi's medical care.

Although we are sympathetic to respondent's argument, we find it unpersuasive. We acknowledge that trust provisions permitting spouse-trustees to make distributions for the support of the spouse-beneficiaries are commonplace. Also, we recognize that nursing homes and other care providers may regularly require spouses or others who may be trustees to assume liability for the expenses. But the statutory language does not accommodate respondent's reading of the statute. The statute prohibits a trustee's use of trust funds to discharge "*any* legal support or other obligations of the trustee to *any* person." Minn.Stat. § 501B.14, subd. 1(2) (emphasis added). The statute does not limit its prohibition to payment of the trustee's primary support obligations. Black's Law Dictionary defines an "obligation," in its popular sense, as "[a] legal ... duty to do or not do something." *Black's Law Dictionary* 1104 (8th ed.2004). In the more technical sense, "obligation" is defined as: "A formal, binding agreement or acknowledgment of a liability to pay a certain amount...." Id. Both definitions encompass respondent's duty to pay for Naomi's care. The plain meaning of the statute's text does not admit the qualification advanced by respondent and the legislature can easily correct any problem it may have created. Absent a constitutional infirmity, judicial rewriting of an unambiguous statute is inappropriate.

Here, respondent had a contractual and statutory legal support obligation to provide for Naomi's health-care and nursing-

home expenses. And Minn.Stat. § 501B.14 plainly, and with no qualification, prohibits trustees from using trust funds to discharge their own legal support obligations. Respondent did so here, and in so doing violated that statute. Respondent argues that this interpretation produces a harsh, and even absurd, result. We disagree. Subdivision 2 of section 501B.14 allows a trustee to avoid the potential harshness of this result by obtaining court approval of expenditures, and subdivision 3 allows settlors to opt out of the reach of this statute "if the terms of the trust refer specifically to this section and provide that this section does not apply." Minn.Stat. § 501B.14, subds. 2, 3(a). Thus, prudent parties may work around the statute. Furthermore, as the ensuing discussion of remedies indicates, the result is tempered by the context.

Respondent's claim that the request is harsh is unpersuasive. Not only was respondent liable for Naomi's care, but the record indicates that they had joint accounts and that respondent had substantial, separate assets that could have been used to pay Naomi's bills. After her death, Naomi's children are the beneficiaries of her trust. Respondent was, or upon her death would be, the sole owner of the joint accounts, which his children would inherit from him. Thus, the choice of whether to pay bills out of her trust was not without significance. We conclude that the district court erred in determining that respondent's distribution was permissible under the statute.

■ Having determined that the statute proscribes the disbursements as made by respondent, we are faced with the question of how the statute is to be enforced. We note that the statute does not provide a remedy for its violation. Appellant seeks to impose absolute, personal liability on respondent. Although this is a possible remedy, section 8.8 of the trust agreement states:

> [No trustee] shall at any time be held liable for a mistake of law and/or fact, for an error of judgment, nor for any loss or injury coming to any trust estate or to any beneficiary thereof ... except as a result of actual fraud or willful misconduct. . . .

Although the per se standard is appropriate in instances of actual fraud/willful misconduct, we are not aware of an application of the per se standard when the trust agreement provides its own standard. Here, there should be appropriate findings of fact and conclusions of law on this issue. This is the function of the district court. The facts referenced in this and the next section are relevant to this undertaking. Accordingly, we remand to the district court with instructions to make factual findings pursuant to section 8.8 of the agreement and to determine the appropriate remedy and damages for respondent's failure to comply with the statute.

### B. Breach–of–Fiduciary–Duty Claims

■ Appellant also argues that the district court erred in allowing respondent's accounting because respondent breached fiduciary duties owed to the trust. Under Minnesota law, trustees owe several fiduciary duties to trust beneficiaries. Most importantly, trustees owe a duty of loyalty to trust beneficiaries. The trustee's "primary duty [is] not to allow his interest as an individual even the opportunity of conflict with his interest as trustee." *Smith v. Tolversen,* 190 Minn. 410, 413, 252 N.W. 423, 425 (1934). A trustee can breach the duty of loyalty by acting for personal gain. *See In re Estate of Lee,* 214 Minn. 448, 9 N.W.2d 245 (1943). But there is no breach of the duty of loyalty where the transaction is explicitly authorized by the terms of the trust. Restate-

ment (Second) of Trusts § 170 cmt. a (1959). Trustees also have a duty to act pursuant to the terms of the trust, and they commit a breach of trust when they fail to do so. *Id.* at § 201. Moreover, trustees owe beneficiaries a duty of full disclosure, *id.* at § 173, are prohibited from co-mingling trust funds with their own personal funds, *id.* at § 179, and have a responsibility to thoroughly maintain an accounting of their management of trust property, *id.* at § 172.

Here, the record indicates that respondent co-mingled trust funds with his own funds, failed to keep the beneficiaries reasonably informed of material facts, refused to respond to appellant's requests for information, failed to maintain an accurate accounting of his management of the trust funds, and failed to inform appellant that he was to serve as a successor trustee after Naomi became incapacitated, even though the trust expressly calls for that appointment. Further, appellant asserts that respondent expended funds from the trust, as opposed to other sources, so as to favor himself and his descendents at the expense of Naomi's children, that respondent attempted to claim the trust's limited partnership interests as his own property, and that respondent intentionally misrepresented the trust's assets. There is support in the record for these claims. But arguments and evidence notwithstanding, the district court made no findings or conclusions regarding appellant's breach-of-fiduciary-duty claims. Appellant's arguments were presented to the district court both in his initial petition and his memorandum of law.

Because the breach-of-fiduciary claims raise important fact issues that the district court did not address, we remand for their consideration. We direct the district court to make any findings of fact necessary to resolve this issue. Further, in the event

the district court concludes that respondent breached his fiduciary duty to the trust beneficiaries, the district court should determine the proper remedy and damages for such a breach.

### C. Consultation of a Medical Advisor and Appointment of a Successor Trustee

■ Appellant also argues that the court's affirmation of respondent's accounting was error because respondent did not follow the provisions of the trust agreement by consulting a medical advisor upon Naomi's incapacitation or appointing a successor trustee in accordance with the terms of the trust.

Section 2.2 of the trust agreement provides:

2.2 *Payments in the event the Grantor becomes Incapacitated.* At any time while the Grantor, in the opinion of the Trustees and a competent medical advisor, is incapacitated through illness or any other cause, the Trustees shall pay to or expend for the benefit of the Grantor, and the Grantor's issue such sum or sums from either the net income from or the principal of the Trust Estate as the Trustees, in the Trustee's discretion, may deem necessary or advisable to provide for the proper support, maintenance, and health of the Grantor, and the Grantor's issue.

Here, respondent never sought an independent medical advisor's opinion to establish Naomi's incapacitation. The district court reasoned that because "[t]here is no dispute that [Naomi] was incapacitated to the extent that she required nursing home care ... the mere failure of [respondent] to obtain an independent medical opinion regarding her capacity is of no consequence." Based on the record in this case, we agree. Appellant does

not challenge the district court's finding that Naomi was incapacitated at the time she entered the Sholom Home. In fact, appellant testified to her incapacity at trial, and appellant conceded such incapacitation from the outset of the litigation. Additionally, appellant has not shown how respondent's failure to consult an independent medical advisor resulted in the misuse of trust assets. We affirm this portion of the district court's decision.

■ Appellant also contends that the district court erred in affirming respondent's accounting because respondent failed to bring to appellant's attention appellant's role as a successor trustee upon Naomi's incapacitation. The district court concluded that respondent's failure to do so was immaterial because "[h]ad [appellant] assumed the duties of successor trustee and had he objected to the payment of his mother's nursing home costs from her trust, the issue would have been brought before the court, which would have ordered payment from her trust." However, this conclusion ignores the conflict of interest respondent faced over whether to use resources from Naomi's trust or their joint accounts to pay her expenses. It further assumes that appellant or an independent, additional trustee either would have concurred that Naomi's trust should bear the primary expense of her care or would not have had any persuasive perspective on the question. The district court may have been presented with a different request if respondent was not the sole trustee. Because we remand for consideration of appellant's section 501B.14 and fiduciary-duty claims, we include in our remand an instruction to the district court to reconsider the adverse effect, if any, of respondent's failure to obtain a successor trustee.

## II.

■ Next, appellant argues that the district court clearly erred in finding that the $100,000 Norwest CD was not trust property. The question of whether property is trust property depends on whether the grantor was the owner of and intended to identify "a definite trust res wherein the trustee's title and estate is separated from the vested beneficial interest of the beneficiary." *Brooks v. Ramsey County Cmty. Human Servs. Dep't,* 405 N.W.2d 432, 435 (Minn.App.1987). The existence of intent is a question of fact. *Dannheim Dev., Inc. v. Mogler,* 412 N.W.2d 398, 400 (Minn.App. 1987).

"Findings of fact ... shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01. In applying Minn. R. Civ. P. 52.01, we view the record in the light most favorable to the district court's judgment and will not reverse merely because we view the evidence differently. *Rogers v. Moore,* 603 N.W.2d 650, 656 (Minn.1999). The district court's factual findings must be clearly erroneous or "manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole" to warrant reversal. *Id.* (quotation omitted). "Findings of fact are clearly erroneous only if the reviewing court is left with the definite and firm conviction that a mistake has been made." *Fletcher v. St. Paul Pioneer Press,* 589 N.W.2d 96, 101 (Minn. 1999) (quotation omitted).

Here, appellant introduced two pages of Naomi's hand-written notes listing various assets held by her and respondent. There are two columns on the first page of the notes, each with headings for Naomi and for respondent. Listed on separate lines below the Naomi heading is: "North Star Bank," "Ridgehill," "Rosewood," "Knollwood," "Norwest CD 100,000 only," and "Piper Jaffray." The second column has

the heading "Jack" and lists several assets. The following page of notes contains the notation: "Jack ?: Norwest # 1191946 CD ... 100,000." Appellant did not present any evidence indicating whether the notes were written before or after execution of the trust.

Respondent offered two documents from Norwest Bank in opposition to appellant's claim. Both documents indicate that the certificate number of the Northwest CD is 4101191946. The first document is a "notice of certificate maturity." This document attributes ownership of that $100,000 CD to "Jack Margolis or Naomi R Margolis," not the Naomi Margolis Revocable Trust. Similarly, the second document, a "CD/Retirement Disclosure," lists "Jack Margolis" as the depositor of the CD.

Appellant argues that Minnesota law employs a presumption that assets traced into the hands of a trustee are presumed to remain in trust, unless the trustee shows otherwise. By requiring a trustee to explain any ambiguity in accounting for trust property, the presumption operates to encourage clear and diligent accounting of trust property. Appellant's recitation of the presumption finds support in early Minnesota caselaw. *See Stein v. Kemp*, 132 Minn. 44, 47, 155 N.W. 1052, 1053 (1916); *Blythe v. Kujawa*, 175 Minn. 88, 92, 220 N.W. 168, 169 (1928).

But appellant's reliance on this presumption is misplaced. This presumption is grounded on the presupposition that the property in question is, in fact, trust property. And the presumption takes effect only after it is shown that the property in question was an asset of the trust at the trust's inception. Here, the district court found that appellant did not meet his evidentiary burden to show that the CD was a trust asset. Because the limited and conflicting evidence presented on the issue is adequate to support the district court's

finding and because we defer to the district court's weighing of the conflicting evidence, we conclude that the district court did not clearly err in finding that the Norwest CD was not trust property.

## DECISION

Because the district court did not clearly err in finding that the Norwest CD was not trust property, we affirm that finding. But because the district court erred in its interpretation and application of Minn. Stat. § 501B.14 (2006), and because the district court did not adequately consider appellant's breach-of-fiduciary-duty and replacement-trustee claims, we remand for consideration of those matters, the appropriate remedy, and damages.

**Affirmed in part, reversed in part, and remanded.**