*This opinion is nonprecedential except as provided by*
*Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0625**

In the Matter of:

Kaycee Houde,
Respondent,

vs.

David Fryxell,
Appellant.

**Filed February 14, 2024
Affirmed
Larkin, Judge**

Crow Wing County District Court
File No. 18-CV-22-4160

Daniel M. Hawley, Gammello-Pearson, PLLC, Baxter, Minnesota (for respondent)

Richard Dahl, Dahl Law Firm, PA, Brainerd, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Bjorkman, Judge; and Halbrooks, Judge.[*]

**NONPRECEDENTIAL OPINION**

**LARKIN**, Judge

Appellant challenges the district court's grant of respondent's petition for a harassment restraining order (HRO), arguing that the HRO was based on conduct that did

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

not constitute harassment as a matter of law, that respondent failed to prove that the conduct adversely affected her, and that the conduct was protected free speech. We affirm.

## FACTS

On November 11, 2022, respondent Kaycee Houde petitioned for an HRO against appellant David Fryxell. Houde and Fryxell were in a relationship and have a minor child together. Houde alleged that Fryxell sent her harassing messages, told people in the community personal information about her, and financially harassed her by giving her money for things related to their daughter and then asking for the money back. She further alleged that Fryxell's conduct compromised her sense of safety, privacy, and security.

On November 14, 2022, the district court granted a temporary HRO. On November 23, 2022, the district court amended the temporary HRO to allow for communication between Fryxell and Houde about "shared parenting issues" through the use of a communication application (Our Family Wizard), to provide for exchanges of their child, and to allow incidental contact during those exchanges.

Fryxell requested a hearing on Houde's petition, and on February 27 and March 3, 2023, a referee heard the matter. Houde testified and called one witness. Fryxell also testified. The parties introduced exhibits, including text-message conversations, conversations that took place on Our Family Wizard, and video recordings.

Houde's witness testified that Fryxell sent him text messages alleging details about Houde's sexual history. The witness testified that Fryxell's texts were "inappropriate." The witness responded to Fryxell's texts, stating that Fryxell was sharing "really personal stuff that [Fryxell] probably shouldn't be sharing with people [he does not] know."

2

Houde testified that Fryxell sent her repeated and unwanted text messages and that she asked him to stop. Houde explained that Fryxell's messages regarded her sexual history and that they were "all a pattern of behavior, and they had been for the many months of [their] relationship." She also testified that Fryxell did not limit his use of Our Family Wizard to communicate only "shared parenting issues."

Fryxell testified that he contacted Houde's witness to find out whether Houde was cheating on him. He also testified that Houde made false allegations to the police about him, called him, assaulted him, and that Houde was the "aggressor" in their relationship.

The district court issued a two-year HRO against Fryxell, finding that he "engaged in harassment which has or is intended to have a substantial adverse effect on [the] safety, security, or privacy of [Houde]."

Fryxell appeals.

## DECISION

This court reviews a district court's grant of an HRO for an abuse of discretion. *Kush v. Mathison*, 683 N.W.2d 841, 843 (Minn. App. 2004), *rev. denied* (Minn. Sept. 29, 2004). The district court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the [district] court to judge the credibility of the witnesses." Minn. R. Civ. P. 52.01; *see Kush*, 683 N.W.2d at 843-44. "A district court abuses its discretion if it makes findings of fact that are not supported by the record, misapplies the law, or resolves the matter in a manner that is contrary to logic and the facts on record." *Borth v. Borth*, 970 N.W.2d 699, 701 (Minn. App. 2022) (quotation omitted). A finding of fact is clearly erroneous if we are left with a "definite and firm

3

conviction" that a mistake was made. *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999) (quotation omitted). "[T]his court will reverse the issuance of a restraining order if it is not supported by sufficient evidence." *Kush*, 683 N.W.2d at 844.

Despite caselaw establishing the standard of review applicable to the district court's grant of an HRO, Fryxell insists that we apply a different standard in this appeal. He argues that a different standard is required because he ordered a transcript of the hearing before the referee and this court is reviewing the decision of the referee. He relies on caselaw regarding attorney-discipline actions in which the standard to be applied depends on whether a party orders a transcript. *See, e.g. In re Disciplinary Action Against Colosi*, 977 N.W.2d 802, 811 (Minn. 2022); *In re Disciplinary Action Against MacDonald*, 962 N.W.2d 451, 460 (Minn. 2021); *In re Disciplinary Action Against Walsh*, 872 N.W.2d 741, 747 (Minn. 2015). For two reasons, we reject this argument.

First, in numerous prior HRO appeals, this court has used the clear-error standard to review findings of fact. *See, e.g.*, *Peterson v. Johnson*, 755 N.W.2d 758, 761 (Minn. App. 2008); *Kush*, 683 N.W.2d at 843. Here, however, Fryxell asks this court to use the standard the supreme court uses in attorney discipline cases. But this is not an attorney discipline case. And, the supreme court "retains exclusive power to regulate attorney discipline proceedings." *In re Disciplinary Action Against Riehm*, 883 N.W.2d 223, 231 (Minn. 2016). Moreover, Fryxell cites no authority supporting application—in this HRO appeal—of a standard the supreme court uses in a proceeding unique to its authority.

Second, it is not clear that applying the supreme court's attorney-discipline standard would produce a different result. Specifically, in attorney-discipline matters, on appeal to the supreme court:

> If a party orders a transcript of the hearing, as [the attorney] did here, the referee's findings of fact and conclusions of law are not conclusive. *But we give great deference to the referee's findings of fact and will not reverse those findings if they have evidentiary support in the record and are not clearly erroneous.* A referee's findings are clearly erroneous when we are left with the definite and firm conviction that a mistake has been made. Moreover, we review the findings of fact to determine whether they support the referee's conclusions of law.

*In re Disciplinary Action Against Coleman*, 793 N.W.2d 296, 303 (Minn. 2011) (emphasis added) (quotations and citations omitted).

A relevant rule provides:

> The referee shall make findings of fact, conclusions, and recommendations, file them with [the supreme court], and notify the respondent and the Director [of the Office of Lawyers Professional Responsibility] of them. . . . Unless the respondent or Director, within ten days, orders a transcript and so notifies [the supreme court], the findings of fact and conclusions shall be conclusive. *If either the respondent or the Director so orders a transcript, then none of the findings of fact or conclusions shall be conclusive, and either party may challenge any findings of fact or conclusions.*

Minn. R. Law. Prof. Res. 14(e) (emphasis added).

Thus, there is little difference between the standard of review applicable to findings of fact in an HRO proceeding and to findings of fact in an attorney-discipline proceeding in which a transcript was ordered. In either case, an appellate court reviews the findings

5

for clear error, giving deference to the findings. *See Coleman*, 793 N.W.2d at 303; *Kush*, 683 N.W.2d at 843-44.

Fryxell has ordered a transcript in this matter and has the right to challenge the district court's findings of fact as clearly erroneous. But that does not mean that we try the case de novo. Indeed, this court is expressly prohibited from finding facts on appeal. *See State v. Colvin*, 645 N.W.2d 449, 453 (Minn. 2002) (stating that "[a]ppellate courts have no . . . business finding facts"). "[A]n appellate court's limited scope of review circumscribes additional fact finding by it . . . ." *Stiff v. Associated Sewing Supply Co.*, 436 N.W.2d 777, 779 (Minn. 1989). As the supreme court has explained:

> The scope of review of an appellate court is narrowly defined. The function of the court of appeals is limited to identifying errors and then correcting them.
> We have criticized before the court of appeals' misapplication of the scope of review when it has usurped the role of the [district] court by reweighing the evidence and finding its own facts . . . .

*Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988) (citations omitted).

We therefore review the findings of fact in this case for clear error, as follows:

> [W]e examine the record to see if there is reasonable evidence in the record to support the court's findings. And when determining whether a finding of fact is clearly erroneous, we view the evidence in the light most favorable to the verdict. To conclude that findings of fact are clearly erroneous we must be left with the definite and firm conviction that a mistake has been made.

*Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013) (quotations and citations omitted). In doing so, we will not usurp the role of the district court by reweighing evidence or reassessing witness credibility.

6

At oral argument to this court, Fryxell's attorney argued that the standard of appellate review requiring this court to defer to a district court's findings of fact unless those findings are clearly erroneous and to defer to a district court's credibility determinations violates due process. Fryxell acknowledges that he did not raise this issue in his briefs. He contends, without legal analysis, that the HRO "implicat[es] Fryxell's due process" rights. He also asserts, without legal analysis, that because the testimony in this case was taken via Zoom, it was more difficult to assess credibility and that the underlying hearing therefore "lacked the full due process which is normally accorded to a party for an in court evidentiary hearing."

"[O]n appeal error is never presumed. It must be made to appear affirmatively before there can be reversal. . . . [T]he burden of showing error rests upon the one who relies upon it." *Loth v. Loth*, 35 N.W.2d 542, 546 (Minn. 1949) (quotation omitted). Mere assertions of error without supporting legal authority or argument are waived unless prejudicial error is obvious on mere inspection. *State v. Mod. Recycling, Inc.*, 558 N.W.2d 770, 772 (Minn. App. 1997). And "issues not adequately briefed are waived." *Brooks v. State*, 897 N.W.2d 811, 819 (Minn. App. 2017), *rev. denied* (Minn. Aug. 8, 2017). For all of those reasons, we do not address the merits of Fryxell's alleged due-process violation.

Having established the standards that govern our review of the HRO in this case, we proceed to the merits of Fryxell's challenge.

## I.

Fryxell contends that the conduct on which the HRO was based was, as a matter of law, insufficient to constitute harassment.

7

The district court may grant an HRO if "the court finds at the hearing that there are reasonable grounds to believe that the respondent has engaged in harassment." Minn. Stat. § 609.748, subd. 5(b)(3) (2022). "'Harassment'" includes "repeated incidents of intrusive or unwanted acts, words, or gestures that have a substantial adverse effect or are intended to have a substantial adverse effect on the safety, security, or privacy of another." Minn. Stat. § 609.748, subd. 1(a)(1) (2022).

The district court explained that it issued the HRO based on "the more recent communications between the parties, which [were] really the central focus of the petition." The district court found that Fryxell sent Houde "repeated communications" that were "offensive, demeaning, and disparaging," and "objectively unreasonable," and that "a reasonable person would feel harassed or oppressed upon receiving those messages." For example, Fryxell called Houde abusive names, including "whore," "crazy," "mentally unstable," and told Houde that she was sexually promiscuous. In addition, while the temporary HRO was in place, Fryxell used Our Family Wizard "to further demean and verbally abuse [Houde]." Finally, Fryxell sent a text message to Houde's witness, in which he made allegations regarding Houde's sexual history. Houde's witness did not know Houde well and, as found by the district court, "the message was not appropriate given the limited acquaintance."

At the hearing, the district court explained that:

> [T]here are the communications that [] Fryxell admits that he sent to [the witness] that are clearly sent with the intent to disparage or demean [] Houde. There's a consistent theme of sexual shaming throughout the communications. That is

8

abundantly consistent throughout, and that is a form of harassment.

The record provides substantial support for those findings. Indeed, Fryxell does not dispute that he sent Houde many text messages over an extended period. The record shows that Houde told Fryxell to stop sending her messages, that his messages were "abusive," and that she did not deserve to be treated that way. Fryxell often responded by sending very long or multiple text messages regarding Houde's alleged sexual activities.[1]

The record also shows that Fryxell sent Houde messages on Our Family Wizard that were not limited to "shared parenting issues," which was the only subject authorized by the district court. Finally, the record shows that Fryxell sent text messages to Houde's witness asserting private information regarding Houde's alleged sexual history. The witness responded that "[t]his sounds like really personal stuff that you probably shouldn't be sharing with people you don't know." The witness testified that he thought Fryxell's messages were "100 percent" inappropriate, that he did not ask Fryxell to send the messages, and that the messages involved allegations about Houde's sexual history.

As to the effect of Fryxell's behavior, Houde testified that Fryxell's communications made her feel "[r]eally bad and disgusting, violated." She testified that the text messages were "all a pattern of behavior" and "a pattern of turning everything around on [her] until [she] would be submissive"; the message made her feel "anxious and helpless" because "it[] [was] just someone attacking [her]"; she felt "[t]hreatened"; and Fryxell's communications made her feel like "everything [she] say[s] is turned around to

---

[1] We do not quote and thereby re-disseminate those messages given their private content.

9

the point where at the end of the day when [she is] in the chaos, [she] feel[s] so confused that [she does not] even know what just happened" and that she has to "reread it all and make sure that [she is] not going crazy." Finally, Houde testified that, based on her knowledge of Fryxell's criminal history, she was concerned that he would continue to send her objectionable messages and she feared for her safety if she did not receive an HRO.

This record is sufficient to show that Fryxell engaged in "repeated incidents of intrusive or unwanted acts, words, or gestures" that had "a substantial adverse effect on the safety, security, or privacy" of Houde. Minn. Stat. § 609.748, subd. 1(a)(1). Fryxell's arguments do not persuade us otherwise. For example, Fryxell argues that the district court ignored evidence showing that Houde assaulted Fryxell, Houde falsely accused Fryxell of rape, Houde attempted to "entice" Fryxell into violating the HRO, and Houde "was the aggressor, showing absolutely [no fear] for her safety, security or privacy." At the hearing, Fryxell argued that such evidence showed that Houde was not credible, Houde was not adversely affected, and the HRO should not have been granted. He urges this court to reverse the HRO on that ground.

Given our standard of review, Fryxell's argument is unavailing. Again, the fact-finder is entrusted to weigh the evidence and assess witness credibility. *See Hasnudeen v. Onan Corp.*, 552 N.W.2d 555, 557 (Minn. 1996) (stating that a reviewing court "traditionally accord[s] great deference to a [district] court's findings of fact because it has the advantage of hearing the testimony, assessing relative credibility of witnesses and acquiring a thorough understanding of the circumstances unique to the matter before it"). This court will "neither reconcile conflicting evidence nor decide issues of witness

10

credibility, which are exclusively the province of the factfinder." *Pechovnik v. Pechovnik*, 765 N.W.2d 94, 99 (Minn. App. 2009) (quotation omitted). And this court will defer to the district court's credibility determination when "[t]he district court's findings implicitly indicate that the district court found respondent's testimony credible." *Id.* Here, Fryxell's attorney cross-examined Houde at the hearing and provided reasons to doubt her credibility. Nonetheless, the district court's grant of an HRO shows that it implicitly credited Houde's testimony. *See id.* We defer to that credibility determination.

Fryxell further argues that his conduct did not adversely affect Houde's "safety, security or privacy," asserting that his remarks were not objectively unreasonable and that they instead were "merely inappropriate and argumentative." *See Peterson*, 755 N.W.2d at 764 (stating that a petitioner must show "objectively unreasonable conduct or intent on the part of the harasser") (quotation omitted)). Houde's testimony—as implicitly credited by the district court—establishes the necessary adverse effect, and the record supports the district court's conclusion that Fryxell's conduct was objectively unreasonable.

Fryxell insists that his conduct was not objectively unreasonable because "Fryxell had the right to inquire regarding whether the person he is dating is cheating on him." Fryxell emphasized this point at oral argument to this court, indicating he will appeal to the Minnesota Supreme Court if this court holds that a person does not have a right to contact a third party to determine if he or she has been "cheated" on.[2] Fryxell's focus on

---

[2] Fryxell argues, "If the law were to the contrary, cheating sexual partners would have the absolute protection of the law to act with impunity, basically ending exclusive dating relationships and marriage."

such a "right" ignores that his statements to the witness exceeded an inquiry into whether Houde had been unfaithful. Fryxell contacted Houde's witness more than once, and he did not limit his inquiry to whether Houde had been unfaithful. Instead, Fryxell provided unsolicited, inappropriate, and poorly received information regarding Houde's sexual history.

Fryxell also argues that caselaw supports his position, but the cases on which he relies involved a *single* incident of unwanted contact. *See Beach v. Jeschke*, 649 N.W.2d 502, 503 (Minn. App. 2002) (holding that the district court abused its discretion by issuing an HRO "based solely on a two-sentence comment made to respondent on only one occasion"); *Peterson*, 755 N.W.2d at 765 ("It is conceivable that the cumulative effect of persistent, baseless attempts to peer inside a person's vehicle might rise to the level of a substantial-adverse effect on that person's safety, security, or privacy, but the evidence does not support a conclusion that the single instance of such conduct in this case had the requisite effect."); *Harris ex rel. Banks v. Gellerman*, 954 N.W.2d 604, 610 (Minn. App. 2021) (reasoning that because harassment requires "*multiple* incidents of adverse and unwanted contact," the district court erred by granting an HRO).

Unlike the cases on which Fryxell relies, the record here establishes multiple incidents of unwanted conduct. Fryxell sent Houde multiple messages with a consistent theme of sexual shaming over the course of weeks. Moreover, Fryxell sent a text message to Houde's witness making assertions regarding her sexual history. This case involves more than a single incident of unwanted conduct.

Finally, Fryxell argues that the district court was prejudiced against him because the district court granted the temporary HRO "immediately," "with very little inquiry into the validity of the allegations." Minn. Stat. § 609.748, subd. 4 (2022), allows the court to issue a temporary HRO if the district court has "reasonable grounds to believe that the [person] has engaged in harassment." "If the petitioner does not request a hearing, the court shall advise the petitioner that the respondent may request a hearing . . . ." *Id.*, subd. 3 (2022). Although "[n]othing in this section shall be construed as requiring a hearing on a matter that has no merit," a review of Houde's petition shows that it was not without merit. *Id.* And, as anticipated under the statute, Fryxell had the opportunity to challenge the basis for the HRO at an evidentiary hearing. The process was consistent with the statute, and Fryxell does not establish any improper prejudice.[3]

In sum, the record provides sufficient evidence to show that Fryxell engaged in repeated incidents of intrusive or unwanted acts that had a substantial adverse effect on Houde's security or privacy, which constituted harassment as a matter of law.

---

[3] Fryxell complains that opposing counsel and the district court relied on his communications to Houde on Our Family Wizard, "which were NEVER even mentioned" in Houde's petition for an HRO. He complains that Houde's petition was not amended to include his texts to Houde on Our Family Wizard, and he argues that Houde had to bring in those texts because the original allegations in her petition were "frivolous." Fryxell does not cite legal authority or provide legal argument indicating that the district court erred by considering his communications on Our Family Wizard. Arguably, a party's alleged failure to comply with restrictions put in place by the district court pending a hearing on a petition for an HRO is relevant to a determination of whether to grant an HRO and if so, the terms of the HRO. Moreover, Fryxell does not explain how he was prejudiced by the district court's receipt of or reliance on his documented statements on Our Family Wizard. Given the allegations in Houde's petition, Fryxell should not have been surprised by the introduction of his own statements at the hearing.

## II.

Fryxell contends that the HRO was based on speech that is protected under the First Amendment and the Minnesota Constitution, that his comments to his therapist were privileged, and that he was allowed to make statements regarding Houde's parenting methods.

As to his First Amendment contention, Fryxell relies on caselaw addressing a First Amendment challenge to Minn. Stat. § 609.749, subd. 7 (2022), which he describes as the "closely related Minnesota criminal harassment statute." But the district court granted Houde's civil HRO petition against Fryxell under section 609.748, and this court has held that conduct constituting harassment under section 609.748 does *not* violate the First Amendment because "the state may regulate certain categories of words or conduct without substantially infringing on speech or expressive conduct protected by the First Amendment." *Dunham v. Roer*, 708 N.W.2d 552, 565 (Minn. App. 2006), *rev. denied* (Minn. Mar. 28, 2006). Specifically, section 609.748 does not violate the First Amendment because it "is directed against constitutionally unprotected fighting words . . . true threats . . . and speech or conduct that is intended to have a substantial adverse effect, i.e., is in violation of one's right to privacy." *Id.* at 566 (quotations omitted). Because Fryxell's communications constituted harassment under section 609.748, they were not protected by the First Amendment or the Minnesota Constitution.

We next consider Fryxell's contention that any comments that he made to his therapist regarding Houde were made in the context of "a legally protected relationship and his statements were privileged and/or protected free speech," such that the district court

14

could not rely upon such comments when granting the HRO.[4] He argues that "[t]here really is no dispute that [he] had a right to discuss his feelings about whether [Houde] was promiscuous with his own therapist." He relies on the therapist/patient privilege, which provides:

> A registered nurse, psychologist, consulting psychologist, or licensed social worker engaged in a psychological or social assessment or treatment of an individual at the individual's request shall not, without the consent of the professional's client, be allowed to disclose any information or opinion based thereon which the professional has acquired in attending the client in a professional capacity, and which was necessary to enable the professional to act in that capacity.

Minn. Stat. § 595.02, subd. 1(g) (2022).

But Fryxell's therapist did not testify at the hearing. And Fryxell does not identify any evidence that was received from his therapist in violation of the privilege at the hearing. Nor does he point to anything in the district court's findings indicating that it relied on such evidence. We therefore discern no error or prejudice justifying relief.

Finally, although Fryxell asserts that his comments regarding Houde's care of their child were privileged or protected free speech, he does not develop this argument. Because Fryxell's assertion on this point is not adequately briefed, we do not discuss it further.

**Affirmed.**

---

[4] According to Fryxell's brief to this court, he "was and is required to see this counselor relating to the criminal case for which he was on probation."